# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Julian K.*, 2012 IL App (1st) 112841

---

| | |
|---|---|
| Appellate Court Caption | *In re* JULIAN K., a Minor, Respondent-Appellee (The People of the State of Illinois, Petitioner-Appellee, v. Jessica K., Respondent-Appellant). |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-2841 |
| Filed | March 9, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The termination of respondent's parental rights was affirmed where the finding that respondent was an unfit parent was not against the manifest weight of the evidence and such termination was in her child's best interests. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-JA-406; the Hon. Bernard J. Sarley, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Abishi C. Cunningham, Jr., Public Defender, of Chicago (Stephanie Foster, Assistant Public Defender, of counsel), for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Nancy Kisicki, and Jennifer Streeter, Assistant State's Attorneys, of counsel), for the People.

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Christopher Williams, of counsel), guardian *ad litem*.

Panel

PRESIDING JUSTICE R. GORDON delivered the judgment of the court, with opinion.

Justices Lampkin and Palmer concurred in the judgment and opinion.

## OPINION

¶ 1     Respondent Jessica K. (respondent) appeals the termination of her parental rights. Termination of parental rights is a two-step process. *In re J.L.*, 236 Ill. 2d 329, 337 (2010); *In re C.W.*, 199 Ill. 2d 198, 210 (2002). First, a trial court must find that the parent is unfit, and second, it must find that termination is in the best interests of the child. *In re J.L.*, 236 Ill. 2d at 337-38; *In re C.W.*, 199 Ill. 2d at 210.

¶ 2     In the case at bar, the trial court held, first, that respondent was an unfit parent. Specifically, on August 29, 2011, the trial court found respondent unfit on three separate grounds: (1) that she failed to maintain a reasonable degree of responsibility to the welfare of her child; (2) that she failed to protect her child from conditions within his environment that were injurious to her child's welfare; and (3) that she failed to make reasonable progress toward the return of her child within nine months after an adjudication that the child was abused or neglected. 750 ILCS 50/1(D)(b), (g), (m) (West 2010). Any one of these three grounds was sufficient to support the trial court's finding. 750 ILCS 50/1(D) (West 2010) ("one or more" of the listed grounds will support a finding that a parent is unfit).

¶ 3     Second, on September 20, 2011, the trial court found that it was in the best interests of the child that respondent's parental rights should be terminated and that a guardian should be appointed with the right to consent to adoption. The child has been living with respondent's sister and her husband in San Diego, California, since August 2009; and they want to adopt him. The respondent's sister has testified that she has no problem with respondent continuing to call or visit her child, so long as respondent is not drinking or taking drugs.

¶ 4    On September 27, 2011, respondent filed a notice of appeal, and this appeal followed. First, respondent claims that the trial court's unfitness finding was against the manifest weight of the evidence, because: (1) the Department of Children and Family Services (DCFS) allegedly failed to provide respondent with appropriate services to reunite her with her son; and (2) she had made substantial progress toward correcting the conditions which caused her son to be removed from her home. In her brief to this court, respondent acknowledges the services that DCFS offered, but claims that DCFS should have offered her "long term in-house treatment" to treat her bipolar disorder, drug addiction, and issues resulting from her own unstable childhood.

¶ 5    Second, respondent claims that the trial court's best-interests finding was also against the manifest weight of the evidence, because the child loves his mother and has not indicated a desire to be adopted.

¶ 6    For the following reasons, we affirm the decision of the trial court.

¶ 7                                    BACKGROUND
¶ 8                                   I. The Parties
¶ 9    Julian K., the child, was born on June 13, 2001, and he is now almost 11 years old. His mother is the respondent and appellant, who is approximately 35 years old. Respondent reported to a caseworker that she completed a year at the University of Chicago but then dropped out due to hospitalization for a mental disorder. Respondent has never been arrested or convicted of a crime.

¶ 10                      II. Petition for Wardship: June 2007
¶ 11    The State filed a petition for adjudication of wardship on June 12, 2007, four days after the almost six-year-old child was taken into custody. The petition alleges that there had been three prior reports of risk of harm, environmental neglect and inadequate supervision. The petition stated that DCFS had opened "an intact family case" in March 2007 and that respondent had not been compliant with the services that had been offered and recommended. The petition alleges that on May 27, 2007, and again on June 6, 2007, the five-year-old child was observed wandering the streets, alone and unsupervised. The petition alleges that respondent, who has a history of substance abuse, had tested positive on June 8, 2007, for "illegal substances," without specifying the substance. The petition alleges that respondent has been diagnosed with both bipolar disorder and ADHD. The petition alleges that respondent admitted that she had "not been compliant with prescribed medication."

¶ 12    On June 12, 2007, the State filed a motion for temporary custody, which was supported by an affidavit by Elizabeth Thomas, a DCFS investigator. Thomas stated, based on her own personal knowledge and information received from others, that the child "was reported several times to be in the neighborhood unsupervised," that the mother "was using drugs in the home," that the mother had been "diagnosed with bipolar and ADHD," that she had tested positive for cocaine, and that she was "not compliant with all of her medications."

¶ 13    On June 12, 2007, the trial court entered a "temporary custody hearing order" which

granted custody to a DCFS guardianship administrator with the right to place the minor. On June 13, 2007, the trial court ordered limited visitation, allowing respondent supervised day visits. Although the record does not contain an order which returned the child to respondent, the child again came to the attention of DCFS, as described below, in a report dated June 4, 2008.

¶ 14                                    III. DCFS Report: June 2008

¶ 15     The report, which was authored by case worker Edward Witherspoon, summarized as follows the problem that again brought the child to the attention of DCFS: "Hotline call alleging that Julian was cooking popcorn in the microwave and got burned. Julian stated that his mom was not home. He told investigator that his mom was in [the] living room. Mom is under care of psychiatrist for mental health issues and is being followed by Dr. Neil Selinger who recommends mom get a job and states that she is a good mom for Julian."

¶ 16     The report stated that, although respondent claimed she was now drug-free, she had tested positive for cocaine on two different dates and had failed to participate consistently in urine testing as requested by Witherspoon, her case-worker. Respondent failed to appear for testing on February 1, March 4 and March 7, 2008. While her tests on March 14 and 28 were negative, the tests on February 14, 2008, and April 11, 2008, were positive for cocaine.

¶ 17     In the report, which was filed with the trial court, DCFS submitted a "services plan" for the child with a "permanency goal" of "Return Home Within 12 Months." The "planned achievement date" was September 1, 2008. However, the report observed that "progress toward goal" had been "unsatisfactory." The report recommended that the child be placed with his aunt in California and that all visits with his mother be supervised. But the report also recommended that respondent "should be afforded an opportunity to complete reunification services."

¶ 18     The report indicated that the child was now living with his godfather, Frank Puccinelli, and that a visitation plan had been established on August 29, 2007, for once-a-week visits, supervised by foster parent Puccinelli. The report stated that Puccinelli was a close family friend whom the child called "Uncle Frank." The report described respondent's interaction with the child and Puccinelli as follows: "Although NM [natural mother] consistently cancels visits, she does visit Julian at least weekly due to the foster parent ensuring that Julian sees her on a weekly basis by rearranging both his and Julian's schedules sometimes at the last minute." The child informed Witherspoon, the caseworker, that he wanted to keep living with Puccinelli. The caseworker concluded that the child had a "strong bond" with both respondent and the foster parent.

¶ 19     Respondent informed the caseworker that, when she was a child, her family moved frequently due to the fact that her mother used drugs and did not pay the rent. Respondent stated that she was hospitalized when she was 13 and diagnosed with bipolar disorder. Respondent reported that her mother presently lives in Poland and her sister lives in California. Respondent stated that her mother left the country when DCFS came to the house and removed respondent. Respondent was then sent to a group home and emancipated out of the system. The caseworker found that respondent's home "needs a lot of cleaning."

¶ 20                    IV. Adjudication Order: June 2008

¶ 21      On June 4, 2008, the trial court entered an "adjudication order" finding that the minor was abused or neglected due to the presence of an injurious environment and a substantial risk of physical injury. The order stated that the "natural mother [was] clearly using substances by her admission and by the positive drug test during the intact cases," and that "the condition of mother's home was inappropriate for minor." The "disposition order," also dated June 4, 2008, adjudged the child to be a ward of the court and placed him in the custody of a DCFS guardianship administrator with a right to place the minor. The disposition order also set a status hearing for November 20, 2008. A "permanency order," entered November 20, 2008, stated that the goal was "return home pending status hearing" on March 6, 2009.

¶ 22             V. Goal of Termination of Parental Rights: June 2009

¶ 23      On March 18, 2009, the trial court ordered respondent to submit to urine testing. Another DCFS report, dated December 2, 2009, stated that respondent did not comply with the March 18 order.

¶ 24      The December 2009 DCFS report, authored by caseworker Jordonna McBee, stated that respondent also missed urine tests on November 25, 2008, December 9, 2008, February 23, 2009, and March 31, 2009. The report stated that: "On June 2, 2009, following a contested permanency hearing, the permanency goal was changed to substitute care pending court determination on termination of parental rights." There is no transcript or bystander's report for the June 2, 2009, hearing.

¶ 25      The permanency order, dated June 2, 2009, also set the matter for a status hearing on November 12, 2009. Also on June 2, the trial court issued another order for urine testing.

¶ 26      The December 2009 report stated that, in July 2009, the child went "for a Pre-Placement visit" with his maternal aunt and her husband in San Diego, where the child was enrolled in the third grade in September. His new foster parents are his aunt and uncle. His original foster parent, Frank Puccinelli, traveled with him to California to assist in the transition.

¶ 27      In the report, the caseworker stated that she had met with the child and that he had adjusted well to his placement in San Diego. Although he missed his prior foster parent, he now wishes to reside with his aunt and uncle, with whom he has a strong bond. The child reported that he talked to Puccinelli "all the time over the phone" and he would see him over the Christmas vacation.

¶ 28      The report stated that, in October 2009, respondent traveled to San Diego to visit her son for three days. The report stated that respondent attended only 13 out of 52 sessions of her substance abuse treatment program, and that she has not participated in urine testing since June 2009, when the permanency goal changed.

¶ 29      In an agreed order, dated December 29, 2009, the parties agreed that respondent would have visitation with her son every other month; that respondent could have additional visitation, so long as she notified her sister a month in advance and the dates worked for her sister; and that respondent could have regular telephone contact.

¶ 30                                VI. Goal of Adoption: 2010

¶ 31        A permanency order, dated January 22, 2010, continued the permanency goal of "substitute care pending court determination on termination of parental rights." On February 23, 2010, the State filed a supplemental petition for appointment of a guardian with a right to consent to adoption.

¶ 32        In a DCFS report dated June 30, 2010, caseworker Jordonna McBee reported that respondent had already traveled twice in 2010 for her visitation in San Diego with her child. However, respondent failed to provide the caseworker with a list of her prescribed medications, as requested, and failed to keep up with her scheduled psychiatrist appointments. Also respondent's attendance at her substance abuse treatment program had been sporadic over the prior six months. The report concluded that the foster parents provided a stable and nurturing environment.

¶ 33                            VII. Best-Interests Determination: 2011

¶ 34        Commencing on March 14, 2011, and concluding on August 29, 2011, the trial court conducted a termination hearing, during which it heard testimony from eight witnesses: (1) Francis Puccinelli, the child's temporary foster parent: (2) Dr. Heather Citron, a psychologist from the Cook County Juvenile Court Clinic; (3) Tiffany Johnson, a caseworker supervisor; (4) Odie Payne, the current caseworker; (5) Christina K., the child's current foster parent, who testified from San Diego by telephone; (6) Jordonna McBee, a caseworker; (7) Edward Witherspoon, a caseworker; and (8) Omega Delgado, respondent's therapist. Their testimony is summarized below.

¶ 35        Francis Puccinelli testified that he was the child's godfather; that he had known the child since birth; and that he had first met respondent through her sister. Puccinelli had dated respondent's sister, and after they broke up, they all remained friends, and respondent had asked him to be the child's godfather. From June 2007 through September 2009, Puccinelli was the child's foster parent. He ceased being the child's foster parent because Puccinelli was not "pre-adoptive," while the child's aunt and uncle wanted to adopt. As a result, the child was placed in San Diego with them.

¶ 36        Puccinelli testified that, while he was the foster parent, he supervised the visits between respondent and her child. From June to September 2007, respondent called her son nightly. Respondent was in a rehabilitation facility early in the summer of 2007, but the nightly calls resumed after her release. However, in September 2007, there was a week when she did not call and Puccinelli could not reach her. At that time, the child was six years old. They did eventually reach her on the telephone, and she sounded "discombobulated."

¶ 37        Puccinelli testified that the supervised visits occurred at restaurants, respondent's home or Puccinelli's home in Oak Park. From October 2007 through February 2008, there were visits but there were also times when respondent failed to show up for previously scheduled visits, without advance notice. Once, respondent left Puccinelli a series of voicemail messages that gave him the impression that she was "high." Puccinelli testified that "there wasn't a visit that went by that something unusual didn't happen." For example, during one visit, when Puccinelli had stepped out of the room for a moment, the child started crying and

respondent acknowledged that she had wiped her nose and stuck the tissue in the child's ear.

¶ 38    Puccinelli testified that, when visits occurred at respondent's apartment, Puccinelli observed that her apartment was always "[c]ompletely unsanitary." He testified that "there is no overstating how unkept her apartment was." Specifically, he testified:

"During this period [of] time [when he was supervising visits], it was without exception always phenomenally unclean. I'm not exaggerating. When you see TV shows and they showed a hoarder or something of that nature, that's how the apartment looked."

Puccinelli testified that respondent had five or six different apartments in five or six years. In one apartment, the toilet bowl was clogged with excrement during more than one visit. Respondent claimed that she was waiting to call the plumber because the rate would be cheaper after the weekend.

¶ 39    Puccinelli testified that, by March 2008, the child had become very comfortable in Puccinelli's home. During that time, respondent would ask the child if he wanted to live with her, and these questions would upset the child, resulting in his being depressed "for periods of time afterwards." In June 2008, they had scheduled a visit so that respondent could take the child bowling to celebrate his birthday, and she did not show up. At first, the child was upset, but he recovered quickly because he had become used to his mother's no-shows. In July 2008, Puccinelli thought that the child had been exposed to pink eye, so the three of them went to a pharmacy. The child told Puccinelli that his mother had opened up a box of eye ointment and had put ointment on his eye and then had put the open box back on the shelf. The child felt that this was stealing. Although the mother denied the event, Puccinelli observed the ointment on the child's eye and the opened box on the shelf. In November 2008, the child stated that he wanted to live with Puccinelli forever; and during that same visit, respondent threw a pretzel snack at the child, which hit the child in the eye.

¶ 40    Puccinelli testified that, in January 2009, he stopped supervising the visits between respondent and the child because he found them stressful. The caseworkers supervised them instead. By March 2009, the child had become excited at the prospect of living with his aunt and uncle in San Diego, and Puccinelli overheard a telephone conversation between respondent and the child, in which respondent was trying to convince the child to choose to live with her.

¶ 41    On cross-examination, Puccinelli testified that respondent consistently expressed a desire to have the child returned to her custody.

¶ 42    The State's next witness, Dr. Heather Citron, was a psychologist employed by the Cook County Juvenile Court Clinic. Citron completed a parenting capacity assessment of respondent in May 2009. During an observation of the respondent and the child on April 17, 2009, Citron found that, at the beginning, the child was engaged with his mother, that she was able to provide him developmentally appropriate activities, and that they had a nice reciprocal conversation. However, after a time, the child withdrew and did not want to engage.

¶ 43    Citron testified that respondent had a substance abuse history since she was 13 years old. Respondent indicated that, when she had difficulty managing her emotions, she would resort to substance abuse. Respondent indicated that "sobriety was boring." Respondent reported

that her own parents had a domestically violent relationship. Respondent further reported that her mother had witnessed her father (or respondent's grandfather) murder her mother (or respondent's grandmother), and that her mother would often rely on respondent for emotional support.

¶ 44    Citron testified that, while she did not do an independent mental health assessment, she was aware that respondent had a history and diagnosis of bipolar disorder and of medication noncompliance. Overall, Citron concluded, to a reasonable degree of psychological certainty, that "it was unlikely that [respondent] would be able to make the needed progress in order to achieve a goal of return home." Citron testified that the "number one" risk factor was respondent's substance abuse.

¶ 45    On cross-examination, Citron testified that she observed an "emotional connection" between respondent and her son.

¶ 46    The State's next witness, Tiffany Johnson, was the supervisor of the caseworker for the child from June 2007 to September 2010. Johnson testified about respondent's lack of consistency with respect to her substance abuse treatment and urine testing, and about respondent's unsatisfactory progress toward a goal of return home. After Johnson's testimony and the admission of the caseworker reports, described above, the State rested, and the case was continued until April 18, 2011. On April 18, the trial court clarified that it had admitted the reports, described above, as business records.

¶ 47    On April 18, 2011, the minor's guardian called one witness, Jordonna McBee, who was the caseworker for the child from March 15, 2009, until January 2011. During this time, the services recommended for respondent were: visits with her psychiatrist; random urine testing twice a month; substance abuse classes; and visitation with the child. Urine tests in April 2009 came back positive for benzodiazepine. When McBee contacted respondent on the telephone about the positive results, respondent stated that she did not understand because she was not doing any drugs. During that time, respondent was prescribed psychotropic medication, and McBee tried unsuccessfully to verify whether benzodiazepine was prescribed.

¶ 48    McBee testified that, by the time she became the caseworker, the goal had already changed to termination of parental rights. When the goal changed, the only service that the agency would pay for was urine testing. McBee also supervised respondent's once-a-month visitation from March 2009 until the minor moved to San Diego, at the end of August 2009. McBee testified that during those visits, sometimes respondent was fine "but a lot of times the natural mother was erratic. Any little thing, if [the child] wasn't paying attention to her or doing what she wanted him to do, she would get upset[.] *** It was up and down[,] all the time."

¶ 49    After McBee's testimony, the trial court permitted, out of order, the testimony of a witness on behalf of respondent, Omega Delgado, respondent's therapist. Specifically, Ms. Delgado provided respondent with group and individual therapies for substance abuse and mental health. They had a few sessions in 2007, and then respondent was scheduled to visit Ms. Delgado on a weekly basis, starting in April 2008. Delgado testified that: "we were able to resolve her use of benzodiazepine. It was suggested that she go into a residential treatment

program, and she did. To my knowledge, she was detoxed from benzodiazepine."

¶ 50    Delgado testified that respondent was scheduled to have a minimum of five hours per week of therapy, both group and individual. From April 2008 until June or July of 2009, respondent's attendance was sporadic but then it improved. By "sporadic," Delgado explained that she meant that respondent would miss whole weeks.

¶ 51    Delgado testified that the last time she met individually with respondent was in March 2011 when they were both in court. Before that, the last time was in November or December of 2010. The mother's diagnosis was a bipolar disorder. The mother reported that she was going to church, talking to the pastor, and attending "12-step" meetings there.

¶ 52    On cross-examination, Delgado testified that respondent was still in need of therapy to deal with both substance abuse and mental health issues. Delgado explained that, although benzodiazepine was originally prescribed by respondent's psychiatrist, it is a highly addictive drug and respondent had become addicted to it. Delgado stated that, in the summer of 2007, respondent entered a residential "detox" facility for benzodiazepine. When asked whether she was aware that respondent had tested positive for benzodiazepine in April 2009, Delgado testified that she did not know that, and that respondent was not prescribed benzodiazepine in April 2009.

¶ 53    On August 29, 2011, the termination hearing resumed, with the minor's attorney calling Edward Witherspoon, a caseworker. Witherspoon testified that he was the caseworker for the minor from May 2007 until March 2009. After respondent tested positive for cocaine in July 2008, Witherspoon asked respondent about the positive result and respondent claimed that her best friend placed something in her drink and she found out later that it was cocaine. Another time in 2008 when respondent tested positive for cocaine, respondent admitted that she had been out with some friends and had a lapse. In March 2009, when Witherspoon left the case, substance abuse was still a problem, because respondent failed to comply with the random testing requirements. Witherspoon testified "[w]hen we would try to address this with Jessica, she was always elusive." By March 2009, when Witherspoon left the case, he felt that respondent had not made any progress toward reunification with her son, because her visitations with her son and her urine testing were "inconsistent" and "sporadic."

¶ 54    On cross-examination, Witherspoon testified that respondent always wanted her son returned. After Witherspoon's testimony, the minor and the respondent rested, and the trial court heard argument. The trial court then found respondent to be an unfit parent on three grounds, namely, the failure: (1) to maintain a reasonable degree of responsibility toward the child; (2) to protect the child from conditions in the child's environment injurious to the child; and (3) to make reasonable efforts to correct the conditions or to make reasonable progress. The parties then proceeded to the second or best-interests phase.

¶ 55    The State's first witness was Odie Payne, the minor's current caseworker, who was assigned in March 2011. Payne testified that, on July 20, 2011, he visited the 10-year-old minor, who had been placed since August 2009 with his maternal aunt and her husband in San Diego. The home appeared safe and appropriate; there were no signs of abuse or neglect. When Payne arrived at the home, the minor and his foster father were in the front yard playing frisbee. After they entered the home, the minor resumed his homework and the foster

father helped him with a few math problems. Payne spoke to the caseworkers in California who observed the home on a twice-monthly basis, and they expressed no concerns. Payne did not have an opportunity to observe the minor interact with the foster mother because she was at work. The foster mother works at a restaurant, and the foster father is a social worker. Payne's recommendation was termination of parental rights, with the minor remaining in the foster parents' home.

¶ 56        On cross-examination, Payne testified that respondent visited with the minor twice in Chicago, once in April 2011 while he was here for spring break and once in June 2011 for his birthday. In June 2011, Payne observed respondent interact with the minor in the home of Frank Puccinelli, the minor's prior foster parent. Payne felt that respondent was guarded and trying to figure out what Payne was looking for. In July 2011, Payne had an opportunity to speak to the minor alone; Payne explained to him what it meant to be adopted and asked the minor if he wanted to be adopted. Payne reported that "[h]e wasn't quite certain about whether or not he wanted to be adopted." The minor stated that "he would rather go back and forth to Chicago" to see his friends and family. When speaking of his family, the minor referred specifically to his "Uncle Frank" but made no specific reference to his mother. Respondent indicated to Payne that she still wanted custody of her son.

¶ 57        On redirect, Payne testified that the foster parents made a point of returning to Chicago for holidays and special occasions like birthdays. Most of the foster mother's family is in Chicago. On recross, Payne testified that both the foster parents and the minor were happy with the once-a-week telephone calls by respondent to her son.

¶ 58        The State's next witness was Christina K., the minor's foster mother, who testified via telephone from San Diego. Christina testified that the child, who was 10 years old and in the fifth grade, had been living with her and her husband for two years. Through DCFS, the minor was receiving both individual therapy and tutoring. The minor was doing well in school and had emotionally bonded with her husband, who is a social worker and the coach for the child's baseball and ice hockey teams. Christina has been a server at the same restaurant for nine years. The child was fully integrated into their family, and they want to adopt him. There are only the three of them living together in the foster home. The foster mother is aware that the child has ties to his Uncle Frank and his friends in Chicago, and the foster mother intends to maintain those relationships. The foster father is aware that Frank was a former boyfriend of the foster mother, and he has no problem with the child maintaining his ties to Frank. The foster mother has no problem with her sister continuing to have telephone contact and visitation with the child, as long as she is "healthy." When asked to clarify what she meant by "healthy," the foster mother stated "sober" and not "drinking or on drugs." During the first eight months of 2011, respondent had five visits with her son, with four visits in Chicago and one in San Diego. When asked about the minor's relationship with respondent, the foster mother stated: "He loves his mom. I know he does." However, the minor is "not much of a phone guy," which makes telephone conversation difficult. As for the visits, sometimes "he doesn't want any more visits," and other times "[h]e would love to see her again."

¶ 59        After the parties rested, the State argued for termination and the respondent asked the trial court not to terminate her residual parental rights, such as the right to visitation. Without

that, she would have no right to maintain telephone contact with her son.

¶ 60    On September 20, 2011, the trial court issued a "termination hearing order," in which it concluded that it was in the best interests of the minor to terminate the mother's parental rights. The order stated that the mother was unfit, by clear and convincing evidence, because she "(b) failed to maintain [a] reasonable degree of responsibility; (g) failed to protect [the] child from conditions in the child's environment injurious to the child's welfare; [and] (m) failed to make reasonable progress toward [the] return of [the] child within 9 months after adjudication." On September 27, 2011, respondent filed a notice of appeal, and this appeal followed.

¶ 61                                ANALYSIS

¶ 62    On this appeal, respondent asks us to hold that the trial court acted against the manifest weight of the evidence when it found: (1) that she was an unfit parent; and (2) that it was in the best interests of her child to terminate her parental rights.

¶ 63    As we stated above, the termination of parental rights is a two-step process. *In re J.L.*, 236 Ill. 2d at 337; *In re C.W.*, 199 Ill. 2d at 210. First, the trial court must determine, by clear and convincing evidence, whether a parent is unfit. *In re J.L.*, 236 Ill. 2d at 337; *In re C.W.*, 199 Ill. 2d at 210. Second, if the trial court makes an unfitness finding, it must determine, by a preponderance of the evidence, whether termination of parental rights is in the child's best interests. *In re D.T.*, 212 Ill. 2d 347, 366 (2004) (expressly adopting a preponderance standard for the best-interests determination); *In re C.W.*, 199 Ill. 2d at 210. On this appeal, respondent contests both findings.

¶ 64                          I. Standard of Review

¶ 65    Generally, a reviewing court will not disturb the findings made by a trial court at a termination hearing unless they are against the manifest weight of the evidence. *In re C.W.*, 199 Ill. 2d at 211 (standard of review for the trial court's unfitness ruling); *In re J.L.*, 236 Ill. 2d at 344 (standard of review for the trial court's best-interests ruling). Thus, the question before us is not what we would have done in the first instance if we had been acting as the trial court and this evidence was presented before us. The question for us, as a reviewing court, is whether the trial court's decision was against the manifest weight of the evidence. *In re J.L.*, 236 Ill. 2d at 344; *In re C.W.*, 199 Ill. 2d at 211.

¶ 66    The reason for this deferential standard is that "the trial court is in a superior position to assess the credibility of witnesses and weigh the evidence" than we are. *In re Stephen K.*, 373 Ill. App. 3d 7, 25 (2007); *In re D.W.*, 386 Ill. App. 3d 124, 136 (2008) ("the trial court, having observed the witnesses and heard their testimony, is in the best position to make credibility determinations"). As a result, we will find that a trial court's decision is against the manifest weight of the evidence only "where a review of the record clearly demonstrates that the result opposite to [the one] reached by the trial court was the proper result." *In re Stephen K.*, 373 Ill. App. 3d at 25; *In re D.W.*, 386 Ill. App. 3d at 139 (a finding is against the manifest weight of the evidence if it is unreasonable, arbitrary, and not based on the evidence).

¶ 68    Respondent claims, first, that the trial court erred when it found her to be an unfit parent. In a termination hearing, the term "unfit" is defined by statute. 750 ILCS 50/1(D) (West 2010); *In re C.W.*, 199 Ill. 2d at 210. A parent is considered "unfit" if the State proves any one of the grounds listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2010)). *In re C.W.*, 199 Ill. 2d at 210. Although the State may allege several grounds in its petition, if it proves any one of them, that is sufficient for a trial court to enter a finding of unfitness. 750 ILCS 50/1(D) (West 2010) ("[t]he grounds of unfitness are any one or more of the following"); *In re C.W.*, 199 Ill. 2d at 210 ("any *one* ground, properly proven, is sufficient to enter a finding of unfitness" (emphasis in original)).

¶ 69    In an order dated September 20, 2011, the trial court stated that it had found respondent to be an unfit parent on three separate grounds. The order stated that respondent: "(b) failed to maintain [a] reasonable degree of responsibility; (g) failed to protect [the] child from conditions in the child's environment injurious to the child's welfare; [and] (m) failed to make reasonable progress toward [the] return of [the] child within 9 months after adjudication."

¶ 70    The trial court's findings are based on the following three statutory sections, which are quoted below:

"(b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare.

* * *

(g) Failure to protect the child from conditions within his environment injurious to the child's welfare.

* * *

(m) Failure by a parent *** (ii) to make reasonable progress toward the return of the child to the parent within 9 months after an adjudication of neglected or abused minor ***." 750 ILCS 50/1(D) (West 2010).

¶ 71    While respondent disputes the first and third grounds on this appeal, she does not dispute the second ground, except to say that DCFS should have done more to help her. She does not dispute that her apartment was filthy or that her five-year-old son was found wandering around the streets. She does not dispute that she has a drug addiction or that her addiction creates an injurious environment for her son.

¶ 72    On this appeal, the mother argues that she was not perfect but that she made efforts that were reasonable for her. She claims that DCFS failed to offer her appropriate services but the only service she identifies that DCFS failed to provide was "long term" and "in-house" rehabilitation. She does not explain how "long term" live-in rehabilitation for her would have been compatible with the return of her son. In addition, evidence in the record indicates that she did receive residential drug treatment. For example, Ms. Delgado, respondent's therapist, testified at the termination hearing that respondent entered a residential treatment program during the summer of 2007 for benzodiazepine.

¶ 73    In support of her claim that the alleged failure of DCFS to provide additional services is

a reason to find her a fit parent, respondent cites only one case: *In re Brandon L.*, 348 Ill. App. 3d 315 (2004). In her brief, respondent states that "[t]he failure to provide a family appropriate service needed for reunification is a violation of due process," and cites in support *Brandon L.* However, *Brandon L.* does not say anything remotely like that. In *Brandon L.*, the mother's sole contention on appeal was she had a right to be present during her child's testimony during the best-interests hearing. *In re Brandon L.*, 348 Ill. App. 3d at 318. She claimed that her exclusion violated both a statute and her right to procedural due process. *In re Brandon L.*, 348 Ill. App. 3d at 318. First, the appellate court held that, although the statute gave the respondent the right to be present, it also gave the trial court the discretion to hear from the minor *in camera*. Since the respondent had not claimed on appeal that the trial court had abused its discretion, the appellate court found no statutory violation. *In re Brandon L.*, 348 Ill. App. 3d at 319-20. Second, although a termination hearing must comport with procedural due process, the appellate court found that the respondent's exclusion did not violate that right. *In re Brandon L.*, 348 Ill. App. 3d at 320-22.

¶ 74　　We have provided a full discussion of the *Brandon* case because we cannot figure out how this case has any bearing on our case. We cannot fathom how a case that is solely about procedural due process provides support for respondent's contention that DCFS's alleged failure to provide her with additional services then barred the trial court from finding her to be an unfit parent.[1]

¶ 75　　There is no question that life dealt respondent a bad hand. Respondent's grandmother was murdered by her grandfather, and respondent's mother witnessed the murder. Respondent's mother then had substance abuse problems. When respondent was only 13, she was hospitalized and diagnosed with bipolar disorder, and eventually sent to live in a group home. We recognize the hurdles that life placed in respondent's path to becoming a good parent, and we feel a great deal of sympathy for her.

¶ 76　　However, there is also no dispute on the record before us that her apartment was continually filthy, that her five-year-old child was found wandering around in the street, and that respondent either failed drug tests or did not show up for them.

¶ 77　　Having read the entire record, we find that it contains support for the trial court's finding of unfitness and that this finding is not against the manifest weight of the evidence.

¶ 78　　　　　　　　　　　III. Second Step: Best Interests

¶ 79　　Since we hold that the trial court's unfitness finding was not against the manifest weight of the evidence, we must now consider whether the termination of respondent's parental rights was against the best interests of her child.

¶ 80　　In the best-interests stage of a termination proceeding, due process does not require

---

[1]The *Brandon L.* case was omitted from respondent's list of points and authorities as required by Illinois Supreme Court Rule 341(h)(1) (eff. July 1, 2008). However, in light of the gravity of the issues being decided and the fact that this was the only case cited by respondent in support of this point, we still gave it our full consideration.

standards as strict as at the unfitness stage. *In re D.T.*, 212 Ill. 2d at 365-66 (explaining why the stricter "clear and convincing" standard is not needed at the best-interests stage). Although the State had to prove unfitness by clear and convincing evidence, it has to prove the child's best interests by only a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d at 366. By the time of the best-interests stage of the proceeding, the trial court has already found the parent to be unfit. Although the parent still has an interest in the best-interests stage, the focus is on the child, and the interests of the parent and the child may differ. *In re D.T.*, 212 Ill. 2d at 363-64. Once the parent has been found unfit, all considerations, including the parent's rights, yield to the best interests of the child. *In re D.T.*, 212 Ill. 2d at 363-64. On appeal, our standard of review is whether the trial court's preponderance ruling was against the manifest weight of the evidence. *In re J.L.*, 236 Ill. 2d at 344.

¶ 81    Section 1-3 of the Juvenile Court Act of 1987 (Act) lists the relevant best-interests factors to be considered. *In re J.L.*, 236 Ill. 2d at 338 (citing 705 ILCS 405/1-3(4.05) (West 2008)). Under this Act, the trial court is required to consider and balance 11 different factors, and to do this multifactor-balancing while keeping in mind the child's age and developmental needs. 705 ILCS 405/1-3(4.05) (West 2010). The Act provides in relevant part:

"Whenever a 'best interest' determination is required, the following factors shall be considered in the context of the child's age and developmental needs:

(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel love, attachment, and a sense of being loved);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child; and
***

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2008).

Our supreme court has observed that balancing these factors is "a difficult and delicate task, requiring a nuanced analysis of the statutory factors." *In re D.T.*, 212 Ill. 2d at 354-55.

¶ 82 Respondent claims that the trial court's best-interests finding was against the manifest weight of the evidence, because the child loves his mother and has not indicated a desire to be adopted. 705 ILCS 405/1-3(4.05)(e) (West 2010) ("the child's wishes and long-term goals"). While this is one factor that the trial court must consider, it is only one of many factors that the trial court must weigh.

¶ 83 In the case at bar, the child is presently living with respondent's sister and the sister's husband in San Diego. He has been living with them for several years, and they want to adopt him. The child is doing well in school, and he is on a couple of sports teams coached by his foster father. Respondent claims that the child has an emotional bond with his mother, and there is evidence in the record to support this claim. However, the sister states that she and her husband are willing to foster a relationship between him and respondent, and respondent has not made any claims that her sister and her sister's husband are inadequate parents.

¶ 84 On these facts, we cannot find that the trial court's balancing of factors was against the manifest weight of the evidence.

¶ 85                                                         CONCLUSION

¶ 86 We hold that the trial court did not act against the manifest weight of the evidence when it found that respondent was an unfit parent and that termination of her parental rights was in her child's best interests.

¶ 87 Affirmed.