NOTICE
Decision filed 12/15/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250600-U

NO. 5-25-0600

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* WILLINGTON R. II, a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Edgar County. |
| | ) | |
| Petitioner-Appellee | ) | |
| | ) | |
| v. | ) | No. 24-JA-13 |
| | ) | |
| Jessy S., | ) | Honorable |
| | ) | Matthew L. Sullivan, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Cates and Justice Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*:  This court affirms the order terminating the respondent's parental rights to her minor child where the circuit court's fitness and best-interest determinations were not against the manifest weight of the evidence.

¶ 2    In April 2025 the State filed a motion to terminate the parental rights of the respondent, Jessy S., to her minor child, Willington R. II, who was born on April 26, 2024. Following unfitness and best-interest hearings, the circuit court granted the State's motion and terminated the respondent's parental rights in June 2025. The respondent now appeals, arguing that the termination of her parental rights was error and should be reversed. This court finds no error and affirms the circuit court's order terminating parental rights.

1

¶ 3                                    I. BACKGROUND

¶ 4                              A. Neglect Proceedings

¶ 5     The minor's father, Jacob R., died in the midst of these proceedings on November 6, 2024. Accordingly, this court's discussion of the facts and issues in this case will focus on the minor and the respondent, who is the minor's mother. Additionally, there was a discrepancy regarding the minor's name, but this matter was resolved by an order of the circuit court.

¶ 6     On April 29, 2024, three days after the minor's birth, the State filed a verified petition for adjudication of wardship as to the minor. The State alleged that the minor was neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)) in that his environment was injurious to his welfare. The supporting factual allegations were that (A) the minor "experienced respiratory distress consistent with methamphetamine withdrawal in newborns;" (B) on March 28, 2024, a drug screen performed on the respondent showed a positive result for methamphetamine; and (C) the respondent had "a reported history of substance abuse."

¶ 7     On April 30, 3024, the circuit court held a shelter-care hearing. Prior to the start of the hearing, the court appointed an attorney for the respondent, and a guardian *ad litem* (GAL), who was an attorney, was appointed for the minor. After witness testimony and arguments from the parties, the circuit court awarded temporary custody of the minor to the Department of Children and Family Services (DCFS). The court informed the respondent that she was required to cooperate with DCFS, to comply with the terms of the service plan, and to correct the conditions that required the minor to be in care, or she would risk having her parental rights terminated.

¶ 8     The record reveals that the minor remained in the hospital for five days after his birth, due to his showing signs of withdrawal. After his release, he was placed with a traditional foster family,

2

where he remained through the termination proceedings. The record also shows that the minor had three older brothers: Riley R. (born January 2008), George R. (born December 2017), and Ridley R. (born January 2019). Those three boys were removed from the respondent and taken into protective custody by DCFS on June 30, 2021; all three were placed with their maternal great-grandmother. Their neglect cases were Edgar County case Nos. 21-JA-13, 21-JA-14, and 21-JA-15. The respondent's parental rights to those three boys were terminated on July 2, 2024.

¶ 9 A family service plan, dated May 31, 2024, was filed with the court on July 9, 2024. The family service plan stated that the respondent "will collaborate and cooperate" with DCFS and with "other providers that have been recommended to her in order to achieve a successful completion of services outlined on her service plan." The respondent participated in an integrated assessment. She signed her initial service plan and said that she would "do services." She had completed domestic violence services and was engaged in parenting services. However, she had "not yet initiated mental health or substance abuse counseling. She is on the waiting list for mental health counseling at HRC [*i.e.*, the Human Resources Center]." She needed to complete a substance-abuse assessment. She had been directed to complete random drug screens, although her past included two refusals to take drug screens and one drug screen that "showed a non-negative for meth." The minor's service plan goal was to return home within 12 months. The service plan goal of the minor's three brothers was substitute care pending the determination of termination of parental rights. On the signature page of the family service plan, there was a notation that the respondent had refused to sign the plan but was given a copy thereof.

¶ 10 On June 21, 2024, the State filed a verified amended petition for adjudication of wardship. The amended petition included one additional factual allegation beyond the three contained in the original petition. In addition to allegations (A) through (C), the amended petition presented

3

allegation (D), which was an allegation that the respondent had not complied with DCFS services in Edgar County case Nos. 21-JA-13, 21-JA-14, and 21-JA-15—the three cases involving the minor's three older brothers—"showing an injurious environment still exists for [the minor] as well."

¶ 11   On July 2, 2024, the circuit court conducted an adjudicatory hearing in this case. The court found that the State had proven two of the four allegations contained in the amended petition for adjudication of wardship, specifically, allegation (3) and the new allegation (4). The court adjudicated the minor neglected. The court ended the adjudicatory hearing by admonishing the respondent that she was "required to cooperate with DCFS, comply with the terms of the service plan, correct the conditions that require the minor to be in care," or else risk termination of her parental rights. See 705 ILCS 405/2-21(1) (West 2024) (court's admonishments to parents after finding that their child has been abused, neglected, or dependent).

¶ 12   On October 1, 2024, the court held a dispositional hearing and determined that it was in the best interests of the minor and the public that the minor be made a ward of the court. The court found that the conditions that had led to the minor's removal had not been corrected. Custody and guardianship of the minor were granted to DCFS. The respondent was ordered to complete a psychological evaluation and to cooperate with treatment recommendations. The court found the goal of having the minor return home within 12 months appropriate.

¶ 13   On March 4, 2025, the circuit court held a permanency hearing. The court found that the respondent had made no reasonable efforts and no substantial progress toward returning the minor home. The permanency goal remained return home within 12 months.

4

¶ 14                                B. Termination Proceedings

¶ 15    On April 24, 2025, the State filed a motion to terminate the respondent's parental rights. The motion alleged that the respondent was unfit to have a child because, during the nine-month period from July 17, 2024, to April 17, 2025, a period after the adjudication of neglect, she (A) had failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor from the respondent, and (B) had failed to make reasonable progress toward the return of the minor to the respondent, pursuant to sections 1(D)(m)(i) and 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i), (ii) (West 2024)).

¶ 16    On April 25, 2025, DCFS filed a report stating that the respondent "had not engaged in substance abuse treatment," had made only "minor progress towards her mental health treatment goals," and had not taken a drug screen since the opening of this case, despite being referred for drug screening and even being offered options of drug-screening methods. The respondent had not made reasonable efforts, or substantial progress, toward the minor's return home, the report concluded. DCFS recommended changing the permanency goal to substitute care pending court determination of termination of parental rights.

¶ 17                                        1. Fitness

¶ 18    On June 24, 2025, the court held a hearing on the issue of the respondent's fitness or unfitness to have a child. As its sole witness at the fitness hearing, the State called Kara Chamoun, a child welfare specialist with DCFS, who was the assigned caseworker.

¶ 19    Chamoun testified that the respondent had participated in an integrated assessment, and in that integrated assessment, she was required, *inter alia*, to complete an assessment and treatment for substance abuse and mental health. In regard to substance abuse, Chamoun testified that the respondent never even completed an assessment during the nine-month period at issue here, July

17, 2024, to April 17, 2025, the respondent did not have any substance-abuse treatment. On June 6, 2025 (*i.e.*, 50 days after the relevant nine-month period had ended), the respondent informed Chamoun that she was starting an online course on substance abuse, however, DCFS had not approved an online course for the respondent "since she could not have random drug screens." During the relevant nine-month period, the respondent did not have any drug screens. Completion of random drug screens "is on [the respondent's] service plan," which Chamoun reviewed with the respondent "every time that [she] had a chance." Chamoun "attempted to have her screened four times, and four times she refused an oral toxicology screen. Four times she did not show to the arranged urine drop."

¶ 20    Chamoun testified that in regard to mental health, the respondent had completed an assessment in July 2024 though she could not recall the exact date. The recommendation was for 26 hours of treatment. However, after the assessment, the respondent did not follow through on treatment. In February 2025 she began treatment with a different treatment provider than the one who had done the assessment. As of June 11, 2025, she had completed 11 of the 26 hours of treatment.

¶ 21    Chamoun also stated that the minor's father, Jacob R., had died on November 6, 2024, of "a meth and fentanyl overdose" at the respondent's apartment. She identified a copy of Jacob R.'s death certificate. She was unaware of whether the respondent was in her apartment at the time of his death.

¶ 22    Chamoun further testified that the respondent, in her integrated assessment, was ordered to complete parenting classes and to maintain stable housing. The respondent had completed parenting classes required in her earlier three cases (involving her three children other than the minor here), and she was taking parenting classes, through a different provider, throughout the

instant case. She needed "11 parenting hours for completion. She had made it to 7 and was unsuccessfully discharged on May 6th [2025]." The respondent reinitiated services, and as of June 11, 2025, she has completed three hours. In short, she had not completed parenting classes within the nine-month period from July 17, 2024, to April 17, 2025. According to Chamoun, the respondent had weekly supervised visits with the minor. From the visits that Chamoun had observed, the visits went well. The respondent is "attentive" to the minor. According to Chamoun, the respondent, through May 2025, had been offered 49 visits with the minor and had missed 15, usually because she "didn't call to confirm the day before," as DCFS required her to do. However, Chamoun could not say how many visits or how many misses occurred during the nine-month period from July 17, 2024, to April 17, 2025.

¶ 23    Chamoun also testified that during the entire nine-month period, the respondent maintained the same apartment. However, the apartment had been "cluttered" during visits, to the point where Chamoun would be concerned about having a child of the minor's age visit. On cross-examination by the respondent's attorney, Chamoun stated that in the respondent's three earlier cases involving the minor's three older brothers, the respondent had completed her parenting classes but had not complied with her substance-abuse or mental-health services.

¶ 24    In closing argument, the State asked the court for a finding of parental unfitness. According to the State, the minor had become "the fourth child where [the respondent] has just not participated with [DCFS]. She has not done the things that Ms. Chamoun has asked her to do." The respondent's counsel, in his argument, stated that the respondent "recently appears to be making good progress," arguing that she should not be found unfit, or in the alternative that the court should "take this [matter] under advisement, set the matter out for a couple of months to see if [the respondent] can finish up all of the services she is currently in." The minor's GAL stated

7

that, "[i]n regard to the fitness, I'd probably agree with the State." The GAL argued that he would be "hard pressed" to conclude that the respondent, during the nine-month period, "made any reasonable progress or even reasonable efforts."

¶ 25     The circuit court found that the State had met its burden of establishing that during the nine-month period from July 17, 2024, to April 17, 2025, the respondent (1) had failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor from the respondent and (2) had failed to make reasonable progress toward the return of the minor to the respondent. "[S]he's refused to do any drug tests," the court stated. "[S]he has had several visits, but she's also missed a third of them with the child." The court found the respondent "not a fit person at this point." With that finding of unfitness, the court immediately proceeded to the best-interest hearing.

¶ 26                                   2. Best Interest

¶ 27     For the best-interest hearing, the State recalled Chamoun, who testified that the minor was one year old at the time of the termination proceedings. He was in a traditional foster home, where he had been since his release from the hospital days after his birth. The relationship between the minor and his foster parents was "very positive." The minor would often cling to his foster mother during Chamoun's monthly visits to the foster home. In the foster home, there was also another child who was in DCFS care, an infant, who had been with the family for two months. The minor had adjusted "pretty good" to the infant, and Chamoun did not have any concerns about his adjustment. The minor received "early intervention services," which had been going well. The foster family had expressed an ability to continue to support the minor. On cross-examination by the minor's GAL, Chamoun testified that during visits between the minor and the respondent, the minor was "usually happy to see [the respondent]."

8

¶ 28    The State also called Loretta Schrock, the minor's foster mother, as a witness. Schrock testified that she was married to the minor's foster father, and the relationship between her husband and the minor was "great." She and her husband took the minor to the doctor without any problem. They were willing to care for the minor and were interested in adopting him if the occasion arose. Also, Schrock testified that the minor and the other infant in their household got along well, and she did not have any concerns about them. There were no other children in the home.

¶ 29    On cross-examination by the minor's GAL, Schrock testified that she was a full-time homemaker and her husband worked in a warehouse. They had sufficient funds to care for the minor, and they owned their four-bedroom home. Under questioning by the court, Schrock stated that the four of them—Schrock herself, Schrock's husband, the minor, and the other infant in DCFS care—were the only ones who lived in the house. She and her husband had no biological children of their own. They both loved the minor, had discussed adoption, and wanted to adopt him.

¶ 30    Neither the respondent's attorney nor the minor's GAL presented witnesses or other evidence at the best-interest hearing. The State argued that it was in the best interest of the minor to terminate the respondent's parental rights. The respondent's counsel argued for taking the matter "under advisement, set a date approximately two to three months down the road to see what progress [the respondent] can continue to make." The GAL commented that after seeing the minor's foster mother, he thought "it's a good placement," and he recommended termination of parental rights.

¶ 31    The court expressed some sympathy for the respondent but stated that he was "more sympathetic to [the minor]," who needed permanency. The court did not choose to take the matter

9

under advisement, as suggested by the respondent's counsel, and instead found that it was in the best interest of the minor that the respondent's parental rights be terminated.

¶ 32 From the order terminating her parental rights, the respondent filed a timely *pro se* notice of appeal. The circuit court appointed the respondent's counsel as her counsel on appeal.

¶ 33                                                    II. ANALYSIS

¶ 34 On appeal, the respondent argues that the circuit court erred in terminating her parental rights. One component of this argument is her contention that the State acted impermissibly when it chose the nine-month period from July 17, 2024, to April 17, 2025, as the period in which to assess whether the respondent had made reasonable efforts or reasonable progress toward having the minor returned to her. She asserts that it was not until October 1, 2024—the date of the dispositional hearing and order—that the circuit court "officially imposed" the various requirements that she needed to meet. Therefore, the nine-month period should have commenced after October 1, 2024. By selecting a nine-month period that commenced prior to October 1, 2024, the State was calling for an assessment of the respondent's performance before the court had even ordered her to do anything. The respondent specifically argues, "To prematurely terminate parental rights, is a violation of [the respondent's] Due Process rights, especially when [the respondent] was making some progress and would have continued to make progress given the opportunity to have her progress viewed in an appropriate timeline."

¶ 35 This argument was not presented in the circuit court. An argument not made in the circuit court is generally forfeited on appeal. See, *e.g.*, *Illinois Farmers Insurance Co. v. Cisco*, 178 Ill. 2d 386, 395 (1997). This argument is forfeited. Forfeiture, however, is a limitation on the parties, not this court. *In re T.B.*, 2020 IL App (1st) 191041, ¶ 68. Given the fundamental liberty interest of parents to raise and care for their children, courts may overlook a party's forfeiture. *In re B.S.*,

10

2022 IL App (2d) 220271, ¶ 36. As such, we will review the nine-month period included in the State's petition.

¶ 36    This court notes that under subsections 1(D)(m)(i) and 1(D)(m)(ii) of the Adoption Act—the grounds for unfitness at issue here—a person's efforts or progress are to be assessed "during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(i), (ii) (West 2024). Thus, "the date on which to begin assessing a parent's efforts or progress" is the date the circuit court entered its order adjudging the minor neglected, abused, or dependent, and not the date the circuit court entered its dispositional order. *In re D.F.*, 208 Ill. 2d 223, 243 (2003). Here, the court adjudicated the minor neglected on July 2, 2024, and the relevant nine-month period commenced on July 17, 2024, a date after the adjudication of neglect. Thus, there was nothing improper about the nine-month period chosen by the State for assessing the respondent's efforts or progress.

¶ 37    Turning to the termination itself, it is undeniable that parents have a fundamental liberty interest in the care, custody, and management of their children. See, *e.g.*, *In re D.T.*, 212 Ill. 2d 347, 363 (2004). Nevertheless, the circuit court has the authority to terminate parental rights involuntarily. The involuntary termination of parental rights under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2024)) is a two-step process. *In re M.I.*, 2016 IL 120232, ¶ 20. The State must first prove by clear and convincing evidence that the parent is unfit under any of the discrete and independent grounds listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *In re M.I.*, 2016 IL 120232, ¶ 20; *In re C.W.*, 199 Ill. 2d 198, 217 (2002) ("the grounds set forth in section 1(D) each provide a discrete basis for a finding of unfitness."). Although the State may rely on several grounds in its motion to terminate parental rights, a finding

11

adverse to the parent on any single ground is sufficient to support a subsequent termination of parental rights. *In re C.W.*, 199 Ill. 2d at 217.

¶ 38     If the court finds that a parent is unfit, the matter proceeds to a second hearing, at which the State must prove by a preponderance of the evidence that it is in the best interests of the minor to terminate parental rights. *In re D.T.*, 212 Ill. 2d at 352, 366. At this stage of the proceedings, the circuit court's focus shifts to the best interests of the child and away from the rights of the parent. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 30. "The parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. A prompt, just, and final resolution of a child's status, as opposed to having that status remain in limbo, is in the child's interests. *In re D.L.*, 191 Ill. 2d 1, 13 (2000).

¶ 39     A reviewing court accords great deference to the circuit court's decisions in termination proceedings because the circuit court is in a better position to observe witnesses and to judge their credibility. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. This court does not reweigh the evidence or reassess the credibility of witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Unless the circuit court's finding of parental unfitness or the child's best interest is against the manifest weight of the evidence, this court will not disturb that finding. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 40                                              A. Fitness

¶ 41     Here, the State's motion to terminate the respondent's parental rights alleged that the respondent was unfit to have a child because, during the nine-month period from July 17, 2024, to April 17, 2025, she (1) had failed to make reasonable efforts to correct the conditions that were

the basis for the removal of the minor from the respondent and (2) had failed to make reasonable progress toward the return of the minor to the respondent. See 750 ILCS 50/1(D)(m)(i), (ii) (West 2024). The circuit court found that the State had proved both of these grounds of unfitness.

¶ 42     If the State proves more than one statutory ground of parental unfitness, a reviewing court need not consider each and every one of those grounds. If there is sufficient evidence to satisfy any single statutory ground, a reviewing court need not consider the other grounds of unfitness. *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005) (reviewing court may affirm if there is sufficient evidence to satisfy any one ground of unfitness alleged in the State's termination petition). This court finds it necessary to consider only the "reasonable progress" ground under section 1(D)(m)(ii) of the Adoption Act. The "reasonable efforts" ground under section 1(D)(m)(i) need not be considered.

¶ 43     A person may be found unfit to have a child if he or she fails "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor *** ." 750 ILCS 50/1(D)(m)(ii) (West 2024). In *In re C.N.*, 196 Ill. 2d 181 (2001), our supreme court examined the "reasonable progress" ground for parental unfitness, beginning with the observation that "progress" is usually defined as movement or advancement toward a goal, and in this particular context, progress toward the goal of having the child returned to the parent. *In re C.N.*, 196 Ill. 2d at 211. Measuring a parent's progress toward the goal of having the child returned

> "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent. *** [C]ompliance with DCFS service plans is

13

intimately tied to a parent's progress toward the return of the child, so much so, that where a service plan has been established to correct the conditions that were the basis for the removal of the child from the parent, the failure to make reasonable progress now includes the failure to 'substantially' fulfill the terms of that service plan." *Id.* at 216-17.

Of course, the service plan must reasonably relate to "remedying a condition or conditions that gave rise or which could give rise to any finding of child abuse or neglect." 325 ILCS 5/8.2 (West 2024) (nature and purpose of service plans).

¶ 44    "[R]easonable progress is judged by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). It is not judged by a subjective standard based upon the progress that is reasonable for a particular person. *Id.* at 1066-67. When determining whether a parent has made reasonable progress, the circuit court only considers the evidence occurring during the relevant nine-month period. *In re Z.M.*, 2019 IL App (3d) 180424, ¶ 68. A parent has made reasonable progress when "the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). "[T]he overall focus in evaluating a parent's progress toward the return of the child remains, at all times, on the fitness of the parent in relation to the needs of the child." *In re C.N.*, 196 Ill. 2d at 216.

¶ 45    Here, the respondent completed an integrated assessment, as mentioned in the family service plan dated May 31, 2024. The integrated assessment required the respondent to complete an assessment and treatment for both substance abuse and mental health. At the June 25, 2025, fitness hearing, Chamoun testified that the respondent never completed an assessment regarding

14

substance abuse. The failure to complete this assessment is of importance, since substance abuse was the principal reason for the respondent's involvement with DCFS. Chamoun also testified that during the relevant nine-month period, July 17, 2024, to April 17, 2025, the respondent did not have any substance-abuse treatment, or any drug screens. Such a performance, or non-performance, by the respondent represents a complete failure in the area of greatest concern—the respondent's relationship with drugs. She remained mired in that problem.

¶ 46    The respondent did complete a mental-health assessment in July 2024 according to Chamoun, and the recommendation was that she complete 26 hours of mental-health treatment. However, Chamoun testified, after the assessment, the respondent did not follow through on treatment. Eventually, in February 2025 she began mental-health treatment with a provider other than the one who had assessed her. However, as of June 11, 2025—nearly two months after the relevant nine-month period had ended—the respondent still had completed only 11 of the 26 hours of treatment. Given the number of hours available in a period of nine months, 11 completed hours of treatment does not show that the respondent actively pursued the necessary treatment.

¶ 47    Chamoun also testified that the respondent had not completed parenting classes during the nine-month period from July 17, 2024, to April 17, 2025. According to Chamoun, the respondent needed to complete 11 parenting hours, but she had completed only seven hours and therefore was unsuccessfully discharged on May 6, 2025, which was after the end of the relevant nine-month period. She then reinitiated services, but as of June 11, 2025 (55 days after the end of the nine-month period), she had only completed three hours.

¶ 48    In light of this testimony by caseworker Chamoun—the sole witness to testify at the fitness hearing—this court concludes that the State proved by clear and convincing evidence that the respondent, during the relevant nine-month period, had failed to make reasonable progress toward

the return of the minor to her. Accordingly, the circuit court's finding that the respondent was unfit to have a child, under subsection (D)(m)(ii) of the Adoption Act, was not against the manifest weight of the evidence. In other words, a finding that she did make reasonable progress is not clearly apparent. See *In re D.F.*, 201 Ill. 2d at 498.

¶ 49                                    B. Best Interest

¶ 50    Once the circuit court found that the respondent was unfit to have a child, it then considered the minor's best interest. See *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80 (once the parent is found unfit, "all considerations, including the parent's rights, yield to the best interests of the child.").

¶ 51    Section 1-3(4.05) of the Juvenile Court Act lists the factors that a circuit court must consider "in the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2024). These must-consider factors include "the physical safety and welfare of the child, including food, shelter, health, and clothing"; the child's sense of attachments, including where he "actually feels love, attachment, and a sense of being valued"; the child's sense of security and of familiarity; the continuity of affection for the child, and the least disruptive placement alternative for the child; the child's need for permanence, which includes the child's "need for stability and continuity of relationships with parent figures, siblings, and other relatives"; "the uniqueness of every family and child"; and the preferences of the persons available to care for the child, including "willingness to provide permanency to the child *** through adoption." *Id.* §§ 1-3(4.05)(a), (d)(i)-(v), (g), (h), (j).

¶ 52    At the best-interest hearing, Chamoun, the DCFS caseworker, testified that the minor had been with the same foster family for just about all of his very young life, and that the relationship between the minor and his foster parents was "very positive." According to Chamoun, the minor

would often cling to his foster mother during Chamoun's monthly visits to the foster home. This testimony indicated that the minor felt loved and had a sense of security and familiarity with his foster family. Early intervention services were going well, Chamoun testified. That bit of testimony was an indication that the uniqueness of the minor, including his needs, was being respected. The testimony of the minor's foster mother, Loretta Schrock, portrayed a thoroughly capable and loving family for the minor. She and her husband's desire to adopt the minor promise to bring him the stability, continuity, and permanency that the minor deserves.

¶ 53　With the testimony of Chamoun and Schrock, the State proved by a preponderance of the evidence that the best interest of the minor would be served by terminating the respondent's parental rights. The court was free to credit their testimonies and to rule as it did on the issue of best interest. The court's determination was not against the manifest weight of the evidence.

¶ 54　　　　　　　　　　　　　III. CONCLUSION

¶ 55　The circuit court's findings on the respondent's unfitness and the minor's best interest, as well as the order terminating the respondent's parental rights, are hereby affirmed.


¶ 56　Affirmed.