NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (4th) 200530-U

NO. 4-20-0530

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 12, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| In re D.H., A.H., and C.H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
| Petitioner-Appellee, | ) | No. 19JA29 |
| v. | ) | |
| Babette H., | ) | Honorable |
| Respondent-Appellant). | ) | J. Brian Goldrick, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Holder White and Steigmann concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed, finding the trial court did not err in terminating respondent's parental rights.

¶ 2     In April 2019, the State filed a petition for adjudication of wardship with respect to D.H., A.H., and C.H., the minor children of respondent, Babette H., alleging the children were neglected and living in an environment injurious to their welfare. In May 2019, the trial court adjudicated the minors neglected, made them wards of the court, and placed custody and guardianship with the Illinois Department of Children and Family Services (DCFS). The State filed a petition to terminate respondent's parental rights in February 2020. Following hearings on the State's petition in August and September 2020, the court found respondent an "unfit person" within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)); the court then found it was in the minors' best interests to terminate respondent's parental rights.

¶ 3     On appeal, respondent argues the trial court erred in terminating her parental

rights; specifically, she alleges the trial court's best-interests determination stands against the manifest weight of the evidence. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5            On April 16, 2019, the State filed a petition for guardianship with respect to D.H. (born November 29, 2007), A.H. (born September 11, 2005), and C.H. (born September 27, 2002), minor children of respondent (mother or Babette H.), alleging the children were neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)), because they lived in an environment injurious to their welfare when in the care of Babette H. After a shelter care hearing, pursuant to the stipulation of neglect and immediate and urgent necessity by Babette H., the trial court placed temporary custody and guardianship of the children with DCFS.

¶ 6            These children came to DCFS's attention two days prior, when D.H. ran away from his mother and refused to return to her home in St. Louis, Missouri. The children had been living in Bloomington, Illinois, with C.H. and A.H.'s former foster mother, Christine Kinzie, since July 2018. The children went to live in Kinzie's home with their parents' permission because neither parent could care for them. In November 2018, D.H. left Kinzie's home and went to live with his father in Peoria, Illinois. He then moved to his mother's Missouri home in January 2019. When D.H. and his mother visited C.H. and A.H. in Bloomington, in April 2019, he refused to return with her and ran away. He told staff at Carle BroMenn Medical Center that he was afraid to return to his parents' care because they physically abused him. Specifically, D.H. reported his mother hit him with a belt and choked him several times. During the subsequent investigation, C.H., A.H., and D.H. each disclosed a significant history of abuse and neglect by both parents.

¶ 7                              A. Adjudicatory Proceedings

¶ 8              At a May 22, 2019, hearing, Babette H. stipulated to the allegation in the State's

petition, claiming, "the children are neglected and that they are under the age of 18 years and are

living in an environment injurious to their welfare when in [Babette H.'s] care in that [she] ha[s]

an extensive history with child welfare services, including termination of [her] parental rights as

to five prior born children," which "creates a risk of harm to the minors." As a factual basis for

the stipulation, the State explained it would call a DCFS investigator who would testify that

Babette H. admitted prior involvement with child welfare services due to domestic violence,

alcohol, and crack cocaine use. The trial court found a factual basis and likewise found Babette

H.'s admission to be knowing and voluntary. The trial court adjudicated the children neglected

minors and set the matter for a dispositional hearing. The trial court then admonished Babette H.

that she must cooperate with DCFS and comply with the terms of any service plan or risk

termination of her parental rights. At the close of the hearing, the trial court issued an

adjudicatory order, documenting its finding that the children were neglected in Babette H.'s care.

¶ 9              Babette H. did not attend the July 10, 2019, dispositional hearing. Her counsel

informed the trial court she had not had any contact with Babette H. since the May hearing. The

caseworker testified she scheduled a home visit with Babette H. for July 5, 2019. But when the

caseworker travelled to Babette H.'s address in St. Louis, Babette H. was not there, her name

was not on any of the mailboxes, and no one there had heard of her. The caseworker testified that

Babette H. told her she lived in a four-bedroom home but the address was an apartment building.

The caseworker testified she tried calling Babette H. several times but the phone was turned off.

The trial court ultimately issued a dispositional order finding Babette H. unfit to care for, protect,

train, educate, supervise, or discipline the children and determining placement with her was

contrary to the children's health, safety, and best interests because Babette H. needs treatment for domestic violence, substance abuse, and mental health issues. The court made the children wards of the court and ordered DCFS to maintain custody and guardianship over them.

¶ 10     The trial court held permanency review hearings on October 10, 2019, and February 26, 2020, which Babette H. did not attend. At each hearing, Babette H.'s counsel informed the court she had not had any contact with her client since May 2019. Counsel reported Babette H.'s phone number was no longer in service. At each hearing, the court determined Babette. H. remained unfit as she had not made reasonable efforts or reasonable progress toward returning the children home. The State filed a petition to terminate parental rights at the February 2020 hearing.

¶ 11                    B. Termination of Respondent's Parental Rights

¶ 12     On March 19, 2019, the State filed an amended petition to terminate Babette H.'s parental rights as to C.H., A.H., and D.H. The State alleged Babette H. was an unfit person pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). The State's petition identified three counts: (1) Babette H. has failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) Babette H. has failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children from the parent during any nine-month period following the adjudication of neglect, specifically the time frame from May 22, 2019, through February 22, 2020 (750 ILCS 50/1(D)(m)(i) (West 2018)); and (3) Babette H. has failed to make reasonable progress toward the return of the children to the parent during any nine-month period following adjudication of neglect, specifically the nine-month period between May 22, 2019, through February 22, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2018)). The State's petition further

contended termination of Babette H.'s parental rights served the children's best interests and asked for custody and guardianship to remain with DCFS, giving it the authority to consent to the children's adoption.

¶ 13　　　　In August 2020, the trial court held a fitness hearing. Again, Babette H. did not attend. Counsel informed the court she had not had any recent contact with her client. Counsel indicated she spoke with Babette H. over the phone in March but had been playing "phone tag" with her since then. Counsel reported Babette H. called her office and left a message on August 4, 2020. As to Babette H.'s whereabouts, counsel said: "I do not know where she is at this time, but I'm ready to proceed."

¶ 14　　　　The parties informed the trial court they agreed on an evidence stipulation, which they tendered to the court. They stipulated that "[a] service plan was put into place on May 15, 2019 for Babette H. *** [She] indicated to the caseworker an understanding of the Service Plan and what was expected of her. *** [S]he was informed failure to cooperate and complete the services *** could result in the termination of her parental rights." The parties also stipulated to the following:

> "During the period from May 22, 2019 through February 22, 2020,
> although [Babette H.] initially expressed a willingness to complete
> services, she failed to begin or complete any of the recommended
> services and objectives from her Client Service Plan. She never
> attended an assessment for mental health or substance abuse and
> never attended a parenting class. She failed to communicate or
> cooperate with her caseworker."

Similarly, the parties stipulated Babette H. completed no services since February 2020. Finally,

the parties agreed: "For the entirety of the case, [Babette H.] has not visited with her children, not communicated with her children in any way, not sent any gifts or letters nor attempted to establish any communication with her children, has not inquired about her children or checked on their well-being." This stipulation is the only evidence the State presented as to Babette H.'s fitness.

¶ 15        On September 22, 2020, the trial court held another hearing on the State's petition to terminate parental rights. Babette H. appeared via Zoom. The court asked counsel if she wanted to present any evidence as to Babette H.'s fitness, and counsel declined and opted for argument only on that point. Counsel acknowledged the evidence stipulation wherein Babette H. admitted she failed to make reasonable efforts to correct the conditions from May 22, 2019, to February 2020, but counsel argued the stipulation did not establish unfitness by a clear and convincing evidence standard.

¶ 16        In arguing for Babette H.'s unfitness, the State argued the "evidence stipulation *** clearly outlined the facts in the case that she *** did not complete any services, has no contact with the children, [and] has not contacted the caseworker." The State argued it proved Babette H. "failed to make reasonable efforts to correct the conditions because she did, during the nine-month period from May 22nd to February 22nd of 2020, did not make any efforts whatsoever to complete the required services."

¶ 17        In announcing its fitness determination, the trial court recounted the various reports relating to Babette H., its prior orders, and the evidence stipulation before expressly stating: "I think it's clear that [Babette H.] has failed to make reasonable efforts to correct the conditions. Again, present at adjudication, admonished, was told she needed to cooperate with the client service plan, then failed to appear from there on out and has not engaged in services."

The court found the State's unfitness allegation that Babette H. failed to make reasonable efforts from May 2019 to February 2020 "proven by clear and convincing evidence."

¶ 18                              C. Best-Interests Determination

¶ 19          The trial court then transitioned into a best-interests hearing. The State called the children's foster mother, Christine Kinzie, to testify. She reported that A.H. and C.H. currently live with her. She stated D.H. currently lived in a residential facility but regularly visits her home. She testified C.H. and A.H. did well in her home. Kinzie stated she encouraged C.H. and A.H. to see or talk with Babette H. but they refused. She testified she loved the children and she believed the children loved her. She testified they shared a strong bond. Kenzie stated she wanted to adopt all three children. She testified she believed staying in her home served the best interests of the children.

¶ 20          The State presented two best-interests reports for the court's consideration, one authored by the court-appointed special advocate (CASA) and the second authored by the DCFS caseworker. The trial court admitted the reports without objection. The CASA report addressed each statutory best-interest factor and culminated in the following summary:

          "It is this CASA's opinion that [C.H.] and [A.H.] are in a
          home that meets their needs and provides a stable and consistent
          environment. The CASA is impressed by the love and support the
          children receive in the foster home. *** This is the only place C.H.
          and A.H. have lived that provides them stability and safety. This
          CASA strongly believes that C.H. and A.H. need permanent
          placement with their current foster family. ***

          Once D.H. successfully completes his residential treatment,

this CASA is hopeful he can be placed with his siblings in the foster home as they are a very closely bonded family.

[C.H.], [A.H.], and [D.H.]'s biological parents have not been able to provide full time care or have demonstrated their willingness to do so. Therefore, this CASA recommends that it is in the best interest of the children that [Babette H.'s] parental rights be terminated."

The DCFS caseworker's best-interests report also outlined each statutory best-interest factor and reached similar conclusions—the children's best interests are served by terminating Babette H.'s rights and proceeding to adoption by their foster mother. Before resting its case and without objection from Babette H., the State asked the trial court to "take judicial notice of the court file, including the *** the testimony that was presented in the unfitness portion of this."

¶ 21 Babette H. then testified. She explained she had not been engaged in the juvenile case because: "I have not had opportunities. I was not given—I wasn't helped with transportation." She informed the trial court she suffered a traumatic brain injury in August 2018 and could not work, so she had no money. She testified she suffered memory loss but she believed she completed some services. Babette H. testified she has attended meetings and groups at Places for People since November 2018. She said Places for People had not yet provided her with verification she attended services. Babette H. testified she was willing to complete remaining services. She said she loved her children and missed them. She testified she did not believe terminating her parental rights served her children's best interests. Babette H. stated she believed she could repair her relationship with her children with visits and family therapy.

¶ 22 In closing, the State argued terminating Babette H.'s parental rights served the

children's best interests, noting each statutory best-interest factor supported termination. The State noted how Kinzie provided the children a "loving and nurturing and stable environment for them to be able to thrive." The State referenced the children's wishes—how "they have expressed strong opinions to be able to stay in that environment." Ultimately the State "ask[ed] the court to terminate all of the parental rights today and change the goal to adoption."

¶ 23        The guardian *ad litem*'s (GAL) closing argument likewise pushed for termination. The GAL noted, when he talked with the children in August 2019, he observed "[t]hey were noticeably happy to be with Ms. Kinzie." The GAL reiterated that C.H. and A.H. showed no interest in returning to their parents. Ultimately, the GAL "recommend[ed] that the Court find it's in the best interest of all the minors to terminate parental rights."

¶ 24        Babette H.'s counsel argued: "I believe it's evident that my client loves her children very much. She doesn't want their parental rights terminated." Counsel believed Babette H.'s traumatic brain injury prevented her from engaging in services in a timely fashion. Counsel argued Babette H. was "doing the best that she can" and only needs more time. Counsel stated: "I don't believe, based upon those reasons, that it's in the minors' best interest for my client's rights to be terminated."

¶ 25        After the arguments of counsel, in reciting its decision into the record, the trial court first explained, "[a]t this phase of the proceeding, the focus switches from the parents to the children." The court stated it must consider the statutory best-interest factors "in the context of these children's age and their developmental needs." The court noted the children are teenagers and "[t]hey don't want to return to their parents," which "certainly is a factor this Court needs to consider *** . [Since] it's a factor under the best interest standard." The court observed how C.H. and A.H. are thriving in their current placement. It noted D.H. "struggled the most" but he was

getting the services he needed while in residential treatment.

¶ 26　　　　The trial court next reviewed each statutory best-interest factor one-by-one, noting whether the factor supported termination. As for the children's physical safety and well-being, the court noted the children are safe and well in their current placements. The court determined this "factor weighs in favor of termination."

¶ 27　　　　Concerning the children's identity, the trial court observed "parents have a strong impact on developing children's identity." The court noted Babette H. has "been absent for the past year," but it did acknowledge the children refused to see their mother. The court determined, "Ms. Kinzie is the one who is helping these children develop their identity at this stage in their life." The trial court recognized Babette H. "had an impact early on in the upbringing of these children[,] [b]ut as we sit here today, it's Ms. Kinzie who's meeting those needs."

¶ 28　　　　The trial court found the factor concerning background and ties (including familial, cultural, and religious background) to be neutral. As for the children's "sense of attachment, where they actually feel love, attachment and sense of being valued, where they're secure, where it's familiar, where there's a continuity of affection, and where it's the least disruptive placement," the court said, "I think that's clearly with Ms. Kinzie." It determined "[t]hose factors clearly weigh in favor of termination." The court noted again how the "children's wishes and long term goals *** weighs in favor of termination of parental rights." The court likewise concluded the factor concerning the children's community ties weighed in favor of termination of parental rights because the children have deep community connections in the current placement.

¶ 29　　　　The trial court found the permanency factor and the risks attendant with continuing in substitute care weighed in favor of termination. The court determined the factors

relating to the uniqueness of every family and the adult's preferences were neutral. Ultimately, the court concluded:

> "So, weighing the factors, while I recognized the love that *** [Babette H.] ha[s] stated [she has] for [her] children, Court believes that it's in the best interest of the children that parental rights of [Babette H.] *** be terminated. The State has established and proven that by more than a preponderance of the evidence."

The court ordered the children remain wards of the court, DCFS remain as the guardian, and the permanency goal be set as adoption.

¶ 30        This appeal followed.

¶ 31                                II. ANALYSIS

¶ 32        Respondent argues the trial court erroneously terminated her parental rights because the court's best-interests determination goes against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 33        The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494, 777 N.E.2d 930, 940 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights—the State must first show the parent is an "unfit person" and then the State must show terminating parental rights serves the best interests of the child. *D.F.*, 201 Ill. 2d at 494-95 (citing 750 ILCS 50/1(D) (West 1998) and 705 ILCS 405/2-29(2) (West 1998)). Here, Babette H. does not challenge the trial court's unfitness finding. Rather, she challenges the trial court's determination at the second step only—the best-interests-of-the-children step—maintaining the trial court erred. We

- 11 -

disagree.

¶ 34      Once a trial court finds a parent an "unfit person," it must next consider whether terminating that person's parental rights serves the child's best interests. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004); see also *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80, 966 N.E.2d 1107 (stating, once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). The State bears the burdens of proof and persuasion and must prove terminating parental rights serves a child's best interests by a preponderance of the evidence. *D.T.*, 212 Ill. 2d at 365-66. When considering whether termination is in a child's best interests, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2018). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072,

859 N.E.3d 123, 141 (2006); see also 705 ILCS 405/1-3(4.05) (West 2018).

¶ 35　　　　A trial court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16, 73 N.E.3d 616.

¶ 36　　　　Babette H. contends the trial court's best-interests determination goes against the manifest weight of the evidence because "the court placed too little weight on the significant development of the children's identities while in her care." She reasons that since her children are teenagers who lived with her much of their lives and since they are now doing so well academically and socially, she must have significantly contributed to their identity and character. Babette H. stated "[a]ll indications are that C.H. and A.H. are smart, hard-working kids. It is unlikely that those traits instantly developed upon placement in foster care." She submits that C.H. and A.H. could "not produce high academic performance in high school if they have not been encouraged to perform academically throughout their childhood." Concerning D.H., Babette H. argued she shaped his identity because he spent "[m]ost of his childhood *** with [her]." Babette H. cites no evidence for these conclusions, though. Besides attacking the development-of-the-children's-identity factor, Babette H. contends D.H.'s lack of community ties to the foster home and C.H.'s age (just days shy of age 18 at the time of the best-interests hearing) weigh against terminating her parental rights.

¶ 37　　　　The record shows Babette H.'s arguments are unfounded. The trial court properly

weighed the best-interests factor relating to the development of the children's identity. Contrary to Babette H.'s claim, the court acknowledged "parents have a strong impact on developing children's identity," and it even surmised: "I would gather to guess that [Babette H.] had an impact early on in the upbringing of these children." But, given the evidence presented by the State in the form of Kinzie's testimony and the two best-interests reports, the trial court also acknowledged that "Ms. Kinzie is the one who is helping these children develop their identity at this stage in their life." These statements show a balanced approach from the trial court. On one hand it recognized that Babette H. shaped her children's identity, but on the other hand it considered how Kinzie contributed to the children's identity once their mother absented their lives. We cannot now say the court placed too little weight on Babette H.'s contribution to her children's identity. The evidence supports the court's best-interests determination generally and its conclusion concerning the identity factor specifically.

¶ 38      To be sure, the State presented ample evidence showing that terminating Babette H.'s parental rights served the best interests of the children. Through testimony from the foster mother, Kinzie, and written best-interests reports from CASA and DCFS, the State showed the children were doing well since leaving their mother's home. For example, the CASA's best-interests report outlined the children's progress since leaving Babette H.'s care. The CASA described C.H. as "an articulate, sociable, thoughtful, and nice young man" who "is closely bonded with his siblings." The CASA described A.H. similarly, characterizing her as "an intelligent, articulate, and well-adjusted young lady" who is also "closely bonded with her siblings and her foster mother." The CASA opined A.H. was "flourishing in the foster home." The CASA's report detailed how D.H. "has been exhibiting improvement in regulating his behaviors, school performance, and responding positively to therapy." The record shows these

children feel loved, valued, secure, and nurtured in their current placements. They have structure in their current placements. All told, this record evidence supports the trial court's decision that terminating Babette H.'s rights served the children's best interests, meaning the decision is neither unreasonable nor arbitrary. See *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 39       Since the evidence does not lead us clearly to the opposite conclusion, we cannot say the trial court's best-interests determination goes against the manifest weight of the evidence. *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 40                                III. CONCLUSION

¶ 41       For the reasons stated, we affirm the trial court's judgment.

¶ 42       Affirmed.