NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220305-U

NO. 4-22-0305

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 6, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* W.E., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
|     Petitioner-Appellee, | ) | No. 20JA124 |
|         v. | ) | |
| Alejandro A., | ) | Honorable |
|     Respondent-Appellant). | ) | J. Brian Goldrick, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Knecht and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1 *Held*: The appellate court affirmed, finding the trial court did not err in terminating
   respondent's parental rights.

¶ 2   In September 2020, the State filed a petition for adjudication of wardship with respect to W.E., the minor child of respondent, Alejandro A. (Alejandro A. or father), alleging the child was neglected and living in an environment injurious to her welfare. Per an admission from W.E.'s mother, the trial court adjudicated W.E. neglected, made her a ward of the court, and placed custody and guardianship with the Illinois Department of Children and Family Services (DCFS). The State filed a petition to terminate respondent's parental rights in November 2021. Following a hearing on the State's petition in March 2022, the court found respondent an "unfit person" within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)); the court then found it was in W.E.'s best interest to terminate

respondent's parental rights.

¶ 3        On appeal, respondent argues the trial court erred in terminating his parental rights; specifically, he alleges the trial court's best-interests determination stands against the manifest weight of the evidence. We affirm.

¶ 4                              I. BACKGROUND

¶ 5        On September 8, 2020, the State filed a petition for guardianship with respect to W.E. (born September 25, 2017), the minor child of S.C. (mother) and two putative fathers, including respondent, alleging the child was neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)), because she lived in an environment injurious to her welfare when in the care of mother and father, both of whom had "unresolved issues of alcohol and/or substance abuse." After a shelter care hearing, pursuant to the stipulation of neglect and immediate and urgent necessity by the mother, the trial court placed temporary custody and guardianship of the children with DCFS.

¶ 6        The child came to DCFS's attention in July 2020, when it received a report alleging mother and father were using crack and heroin around the child, they were unstable with no place to live, and father may have sexually abused W.E. DCFS took protective custody of W.E. and placed her with the maternal grandmother and her husband (collectively grandparents or the Robertses). Mother tested positive for amphetamines, methamphetamine, and tetrahydrocannabinol (THC). Despite diligent efforts by DCFS and the State, father could not be located because he was avoiding law enforcement. Meanwhile, deoxyribonucleic acid testing revealed the other putative father was not W.E.'s biological father.

¶ 7                          A. Adjudicatory Proceedings

¶ 8        At a December 9, 2020, hearing, mother admitted the allegation in the State's

petition, claiming, W.E. "is neglected in that [W.E.] is under the age of 18 years and is living in an environment injurious to her welfare when in [mother's] care in that [mother has] unresolved issues of alcohol and/or substance abuse," which "creates a risk of harm to the minor." As a factual basis for the admission, the State explained it would present evidence showing mother "tested positive for methamphetamine and THC on July 27th of 2020," and "[o]n August 25th of 2020, she was in possession of methamphetamine per an incident report 20210337." The trial court found a factual basis and likewise found mother's admission to be knowing and voluntary. The trial court adjudicated W.E. a neglected minor and set the matter for a dispositional hearing. The trial court then addressed the State, saying: "[W]ith respect to previous and potential default on [Alejandro A.], we were awaiting a return of the summonses that were issued. There is a return on file with respect to the Allen Street address but not the Center Street Address [*sic*]." The State responded it could try to re-serve Alejandro A. at the Center Street address. At the close of the hearing, the trial court issued an adjudicatory order, documenting its finding that W.E. was neglected in mother's care and that Alejandro A. had not been served with a summons but had been notified by publication.

¶ 9 Father did not attend the January 20, 2021, dispositional hearing. He failed to appear at any previous hearing, but the State was unable to confirm he was in custody elsewhere. The State requested a default finding for Alejandro A. because it served him through publication and attempted to serve Alejandro A. at his known addresses. The trial court granted the State's request and defaulted Alejandro A. Meanwhile, the State argued mother remained unfit because she had not completed any services. Mother acknowledged her shortcomings and agreed with the State's recommendations. The trial court heard testimony from W.E.'s grandmother, who said W.E. was "doing well" and "[s]he's happy just being a regular little toddler who's definitely

challenging." The trial court ultimately entered a dispositional order finding both mother and father unfit to care for, protect, train, educate, supervise, or discipline W.E. As it relates to father, the trial court found father unfit because "his whereabouts are unknown and he has not had any contact with the caseworker or the minor." The court made W.E. a ward of the court and ordered DCFS to maintain custody and guardianship over her.

¶ 10 The trial court held permanency review hearings on June 16, 2021, and November 18, 2021. Father eventually appeared in person in the custody of the McLean County sheriff at the June hearing. He informed the court he was currently housed at the McLean County jail awaiting transport to the Department of Corrections (DOC) to serve a three-year sentence. Father did not appear at the November 2021 hearing due to a COVID-19 quarantine in DOC. At each hearing, the court determined mother and father remained unfit as they had not made reasonable efforts or reasonable progress toward returning the child home. Concerning father, the trial court noted he was incarcerated in DOC for drug convictions and unable to participate in services. The State filed a petition to terminate parental rights at the November 2021 hearing.

¶ 11 B. Termination of Respondent's Parental Rights

¶ 12 On November 18, 2021, the State filed a petition to terminate father's parental rights to W.E. The State alleged Alejandro A. was an unfit person pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). The State's petition identified three counts: (1) Alejandro A. is depraved (750 ILCS 50/1(D)(i) (West 2020)); (2) Alejandro A. has failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any nine-month period following the adjudication of neglect, specifically the time frame from February 15, 2021, through November 15, 2021 (750 ILCS 50/1(D)(m)(i) (West 2020)); and (3) Alejandro A. has failed to make reasonable progress toward the return of

the child to the parent during any nine-month period following adjudication of neglect, specifically the nine-month period between February 15, 2021, through November 15, 2021 (750 ILCS 50/1(D)(m)(ii) (West 2020)). The State's petition further contended termination of Alejandro A.'s parental rights served the child's best interest and asked for custody and guardianship to remain with DCFS, giving it the authority to consent to the child's adoption.

¶ 13 In March 2022, the trial court held a hearing on the State's petition. As to fitness, the State proceeded on the depravity allegation only. It submitted four exhibits documenting four felony convictions for Alejandro A., spanning from 2016 to 2020. Alejandro A. did not object to the exhibits and the trial court admitted them. Neither Alejandro A. nor the guardian *ad litem* (GAL) presented any evidence as to fitness. The trial court noted the State's evidence created a rebuttable presumption that Alejandro A. was depraved and since there was no evidence presented to rebut it, then "the State has proven by clear and convincing evidence that [Alejandro A.] is depraved." It found Alejandro A. unfit and proceeded to the best-interest inquiry.

¶ 14 The State asked the trial court to take judicial notice of the file, particularly its prior orders and docket entries. The State presented two best-interest reports for the court's consideration, one authored by the court-appointed special advocate (CASA) and the second authored by the caseworker. The trial court admitted the reports without objection. The caseworker's report addressed each statutory best-interest factor and culminated in the following summary:

> "The agency is confident that it is in the best interest of [W.E.] to remain in her current foster home. Layla and Mike have loved and provided care for [W.E.] since her placement at the beginning of the case. Worker believes this is the most stable home that [W.E.] has lived in and removing her from this home

would have a negative impact on her healthy attachment and ability to form secure bonds with adults and fellow children. Layla and Mike also understand the importance of family and are more than willing to ensure a level of connection between [W.E.] and her biological family. Layla and Mike love [W.E.] and will continue to be a support for her for the rest of her life.

[W.E.] has little to no relationship with her biological father, [Alejandro A.] At case opening, prior to his incarceration, Alejandro had no contact with worker or agency and thus participated in no visits or services. Paternity was established for Alejandro on 11/2/20. Alejandro was determined to be the biological father of [W.E.] Due to his lack of communication at the beginning of the case, and now current incarceration, Alejandro has not participated in any services at this time. Alejandro is not a safe return home option for [W.E.].

\*\*\*

In regards to [W.E.], agency believes it is in the best interest of this child to remain in her current foster home with Layla and Michael Roberts and for the parental rights of [Alejandro A.] to be terminated."

The CASA's best-interest report also outlined each statutory best-interest factor and reached similar conclusions—W.E. is thriving in her current environment and her best interest are served by terminating Alejandro A.'s rights.

¶ 15        The State then called Mike Roberts, W.E.'s foster parent. Roberts testified he had been married to W.E.'s maternal grandmother for 16 years, making him stepfather to W.E.'s mother and step-grandfather to W.E. He testified W.E. came into his and his wife's care in September 2020, though they had cared for W.E. intermittently before then. Roberts described

W.E. as smart, kind, helpful, and curious. He detailed a normal day in their household, including getting W.E. ready for school, making her breakfast, taking her to and from school, and playing at the park. Roberts believed W.E. had transitioned well into the home and they share a bond. Roberts stated he loved W.E. and was willing to adopt her. Roberts testified he believed it would be important for W.E. to have relationships with her biological parents and would allow that "maybe later down the road when everything—you know, a few years from now when everybody is doing good." He opined W.E. "needs a relationship with her mom and dad."

¶ 16      On cross-examination, Roberts reiterated W.E. and her mother lived with him and his wife before this case began in September 2020. When asked about his past relationship with Alejandro A., Roberts described it as "[a] little bit," and "not too much." Roberts again stated he was open to Alejandro A. being involved in W.E.'s life, saying: "[S]he's asked about him. She knows who he is and has a relationship with him. And I don't want to take that away. I grew up without my father. So, yeah, I mean I don't want her to have to do that."

¶ 17      Alejandro A. testified in support of his cause. He confirmed he is incarcerated in DOC in Vandalia, Illinois. He testified he tries to participate in any programs that become available and he completed various DOC programs, including: a domestic violence class, the Aim Higher program, a faith-based seminar for fathers, and a career technology college class. Alejandro A. testified he plans to go to a halfway house once he is released. He expressed his desire to be a good father but acknowledged: "I know I have made bad choices as a father, and I have steps I need to take before I can even be a good father."

¶ 18      On cross-examination by the GAL, Alejandro A. testified he needed to address his addiction, noting, "all my convictions are from dealing with addiction and drugs. So, that's the biggest thing in my life right now that I need to deal with." Alejandro admitted "[i]t still scares

me a little bit," knowing he will have to battle his addictions outside the controlled environment of DOC. He stated it will take time to learn to live without drugs.

¶ 19 After the arguments of counsel, in reciting its decision into the record, the trial court first explained, "[a]t this stage of the proceedings, the focus shifts from the parents to the child. And the question for the Court is what's in the best interest of [W.E.] at this time?" The court noted the State bears the burden of establishing by a preponderance of the evidence that it is in the best interest of the minor to terminate parental rights. The trial court commended Alejandro A. for acknowledging his past bad choices and taking steps to remedy them. But the court also noted Alejandro A. is still incarcerated and will need to be able to prove he can lead a consistently law-abiding life outside DOC. It noted 4½-year-old W.E. had been in foster care for 18 months—one third of her life. The trial court reviewed the evidence presented, particularly Roberts's testimony about him and his wife caring for W.E. before and after this case began.

¶ 20 The trial court next reviewed the statutory best-interest factors, noting whether they supported termination. As for W.E.'s physical safety and well-being, the court noted the grandparents provide the day-to-day care W.E. needs, *i.e.*, food, shelter, doctor's appointments and being taken to Head Start. The court determined this factor weighs in favor of termination.

¶ 21 Concerning W.E.'s background and ties (including familial, cultural, and religious background), the trial court noted familial ties "stands out" because her foster parents are also her maternal grandparents, and they can ensure W.E. keeps in contact with the maternal side of the family. As for W.E.'s sense of attachment, the trial court found, "she gets that love and attachment from her grandparents. There's clearly an attachment between the two of them." The court noted W.E. considered her grandparents' house her "home," and she found security, continuity, and affection in that home.

¶ 22   Turning to the least-disruptive-placement factor, the trial court found: "I think any type of change would certainly be traumatic to [W.E.]" It next observed W.E. was too young to voice her wishes or long-term goals for her placement. The trial court noted W.E.'s community ties included school and friends. It found W.E. had adapted well to Head Start and had a friend there, despite a "rocky start."

¶ 23   The trial court found the permanency factor "certainly weighs heavily in this case" because of W.E.'s age (4½) and her time in foster care (18 months). It noted "18 months is a long time [and a] lot occurs during that 18 months[,] [a]nd I think we need to establish permanency for [W.E.]" Ultimately, the court concluded: "So, as I review the factors here today, I think the State has established, not only by a preponderance of the evidence, but by clear and convincing evidence that it's in [W.E.]'s best interest, unfortunately, that [Alejandro A.'s parental rights] be terminated here today." The court ordered W.E. remain a ward of the court, DCFS remain as the guardian, and the permanency goal be set as adoption.

¶ 24   This appeal followed.

¶ 25                              II. ANALYSIS

¶ 26   Respondent argues the trial court erroneously terminated his parental rights because the court's best-interest determination goes against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 27   The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2020)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494, 777 N.E.2d 930, 940 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights—the State must first show the parent is an "unfit person," and then the State must show terminating parental

rights serves the best interest of the child. *D.F.*, 201 Ill. 2d at 494-95 (citing 750 ILCS 50/1(D) (West 1998) and 705 ILCS 405/2-29(2) (West 1998)). Here, Alejandro A. does not challenge the trial court's unfitness finding. Rather, he challenges the trial court's determination at the second step only—the best-interest-of-the-child step—maintaining the trial court erred. We disagree.

¶ 28 Once a trial court finds a parent an "unfit person," it must next consider whether terminating that person's parental rights serves the child's best interest. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004); see also *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80, 966 N.E.2d 1107 (stating, once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). The State bears the burdens of proof and persuasion and must prove terminating parental rights serves a child's best interest by a preponderance of the evidence. *D.T.*, 212 Ill. 2d at 365-66. When considering whether termination is in a child's best interest, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2020). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the

uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072, 859 N.E.3d 123, 141 (2006). See also 705 ILCS 405/1-3(4.05) (West 2020).

¶ 29　　A trial court's finding that termination of parental rights is in a child's best interest will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16, 73 N.E.3d 616.

¶ 30　　Alejandro A. contends the trial court's best-interest determination goes against the manifest weight of the evidence because it placed too much weight on W.E.'s sense of attachment and her need for permanence while it placed too little weight on "a potential relationship" W.E. may have with her father. We observe, initially, the trial court reviewed each of the statutory best-interest factors in making its decision. Further, we note Alejandro A. essentially asks this court to reweigh the evidence and arrive at a different conclusion, which we cannot do. See *In re S.M.*, 314 Ill. App. 3d 682, 687, 732 N.E.2d 140, 144 (2000) ("The reviewing court does not reweigh the evidence or reassess the credibility of the witnesses.").

¶ 31　　The record shows Alejandro A.'s argument is unfounded. The evidence showed W.E. enjoys a strong bond and attachment to her grandparents. Both best-interest reports noted W.E. had a "strong attachment" to her grandparents. The CASA's and caseworker's reports noted the family shows affection and W.E. receives security and continuity in her grandparents'

- 11 -

home. Likewise, Roberts testified he and his wife are bonded to W.E. and love her. He explained: "I love her to death. She's about the most important thing in my life. I wouldn't have it any other way." Father argues these facts should "receive a lesser weight" because his "ability to provide security and affection for W.E. was challenged" and he "plans to build these attachments with this daughter" once he leaves DOC. We do not see such a challenge in the record. Rather, the record shows Alejandro A. had little attachment to W.E. before this case began, best evidenced by his disappearance for several months while his daughter was in foster care. The record suggests Alejandro A. only appeared and participated in this case after he was arrested on methamphetamine charges. Considering this evidence, we conclude the trial court properly weighed the best-interest factor relating to W.E.'s sense of attachment when it determined W.E. "gets that love and attachment from her grandparents" and "[t]here's clearly an attachment between the two of them."

¶ 32        Alejandro A. next reasons the trial court overemphasized the permanency factor because the stability of W.E.'s current placement "mitigates the importance of a permanent parental solution such as adoption." We find this argument flummoxing. Alejandro A. cites no authority for delaying permanence to allow a biological parent indefinite time to become an appropriate "permanent parental solution." In reality, a child's need for permanence resounds through Illinois law. See 705 ILCS 405/1-2 (West 2020) (establishing permanency for children as a purpose and policy of the Juvenile Court Act); 705 ILCS 405/1-3(4.05)(g) (West 2020) (listing a child's need for permanency as a best-interest factor); *In re D.F.*, 208 Ill. 2d 223, 231, 802 N.E.2d 800, 805 (2003) ("A stated purpose of the Juvenile Court Act is to secure permanency for minors who have been removed from the custody of their parents 'at the earliest opportunity.' " (quoting 705 ILCS 405/1-2(1) (West 2000)). Here, father acknowledged he will

have to continue working on ending his addiction to drugs after he is released from DOC. He acknowledged it will take time to overcome his addiction. Even though she is in a stable placement, W.E. should not be made to wait for a permanent home and permanent parents. Noting the time W.E. had already spent in foster care (18 months), the trial court determined, "I think we need to establish permanency for [W.E.]" Given the evidence before it and the importance of permanency in the governing law, we cannot conclude the trial court placed excessive weight on W.E.'s need for permanence.

¶ 33        Alejandro A. finally argues the trial court placed too little emphasis on the "potential relationship" he may have with W.E. in the future and "the possibility of reunification." As Alejandro A. concedes, this is not a relevant factor in the best-interest analysis. Nevertheless, the record belies this argument as well. Roberts acknowledged the importance of the father-child relationship and testified he would allow W.E. to see Alejandro A. when appropriate in the future. And the trial court even noted the Robertses "are willing to allow [future] contact" between W.E. and Alejandro A. depending upon the latter's behavior. The trial court properly factored a potential relationship between W.E. and Alejandro A. into the best-interest determination.

¶ 34        To be sure, the State presented ample evidence showing that terminating Alejandro A.'s parental rights served the best interest of the child. Through testimony from Roberts and written best-interest reports from the CASA and the caseworker, the State showed W.E. is thriving in her grandparents' home. For example, the CASA described W.E. as "a happy, articulate four-year-old" who "has adjusted very well to living in this placement and is developing and thriving in this environment." The caseworker described W.E. similarly, characterizing her as "happy and healthy" and "outgoing and incredibly smart," and also "doing

very well in her current placement" with "a very strong bond with her foster parents." All told, this record evidence supports the trial court's decision that terminating Alejandro A.'s rights served W.E.'s best interest, meaning the decision is neither unreasonable nor arbitrary. See *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 35        Since the evidence does not lead us clearly to the opposite conclusion, we cannot say the trial court's best-interest determination goes against the manifest weight of the evidence. *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 36                                III. CONCLUSION

¶ 37        For the reasons stated, we affirm the trial court's judgment.

¶ 38        Affirmed.