NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251091-U

NOS. 4-25-1091, 4-25-1092 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 19, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* H.H. and J.H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
|     Petitioner-Appellee, | ) | Nos. 23JA17 |
|     v. | ) |     23JA111 |
| Felicia H., | ) | |
|     Respondent-Appellant). | ) | Honorable |
| | ) | Katherine G. P. Legge, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Doherty and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court granted appellate counsel's motion to withdraw and affirmed, finding the trial court's termination of respondent's parental rights was not against the manifest weight of the evidence.

¶ 2    In January 2025, the State filed petitions for termination of parental rights against respondent, Felicia H., the mother of H.H. (born in June 2023) and J.H. (born in October 2013). In October 2025, the trial court granted the petitions and terminated Felicia's parental rights.

¶ 3    On appeal, appellate counsel filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), arguing Felicia's appeal presents no potentially meritorious issues for review. We agree with counsel. Accordingly, we grant the motion and affirm the trial court's judgment.

¶ 4                         I. BACKGROUND

¶ 5                                      A. J.H.

¶ 6            On January 23, 2023, the State filed a shelter care petition, alleging J.H. was

neglected because his environment was injurious to his welfare. See 705 ILCS 405/2-3(1)(b)

(West 2022). According to the petition, Felicia went to J.H.'s primary school to register him on

September 1, 2022, which was the first day of class. She "was picking at her skin, scratching,

moving erratically and seemed under the influence." When the school day ended, Felicia was not

there to pick up J.H. The school's phone calls to Felicia went straight to voicemail, and Felicia

did not give the school an emergency contact. A school resource officer went to Felicia's house,

but nobody answered the door. Felicia ultimately appeared at the school an hour late, and she

appeared to be under the influence. An Illinois Department of Children and Family Services

(DCFS) investigator attempted to meet with J.H. at school the next day, but he was not in

attendance. The investigator managed to speak with J.H. on September 6, 2022, at which time

J.H. refused to cooperate, saying Felicia "told him not to talk to anyone from DCFS." The

investigator made numerous attempts to contact Felicia, but he received no response.

¶ 7            On September 21, 2022, DCFS received a report that Felicia was "staying with a

maintenance worker at her apartment building who [was] abusing crack." Neighbors could hear

"adults yelling and screaming at [J.H.] and using profanity and calling [J.H.] names." The report

asserted Felicia "appeared to be under the influence," and "she was rambling and saying stuff

over and over again." On the same day, a different DCFS investigator met with J.H., but he still

refused to cooperate. The investigator made several unsuccessful attempts to contact Felicia in

person. On November 29, 2022, school officials informed the investigator that J.H. had not

attended school since November 15, 2022.

¶ 8            On January 3, 2023, DCFS received a report that Felicia dropped off J.H. at a

friend's house and failed to return to pick him up the following morning. J.H.'s maternal grandmother, Stacy Z., eventually picked him up. According to Stacy, "Felicia has a long history of leaving [J.H.] with friends and not picking him up." The report indicated Felica "was possibly homeless." DCFS received another report the following day, which asserted Felicia had not been with J.H. "for approximately a week," and Felicia would consistently fail to pick up J.H., even when arrangements were made.

¶ 9 The DCFS investigator eventually determined J.H. had been staying with Stacy since the beginning of January 2023, and J.H. "had little contact with [Felicia] during that time." J.H. had been out of school since November 2022. Stacy had been unable to obtain proper medical care for J.H. When the State filed its petition, Felicia faced pending charges in Mason County case No. 22-CF-44 for domestic battery with physical contact and aggravated battery of a victim over the age of 60.

¶ 10 On May 12, 2023, the trial court entered an adjudicatory order, finding J.H. neglected. On June 9, 2023, the court entered a dispositional order, finding Felicia unfit due to her substance abuse, mental health concerns, and inadequate supervision of J.H.

¶ 11                                B. H.H.

¶ 12 On October 6, 2023, the State filed an amended shelter care petition, alleging H.H. was neglected because her environment was injurious to her welfare. See 705 ILCS 405/2-3(1)(b) (West 2022). The petition alleged H.H.'s umbilical cord blood tested positive for methamphetamine, and Felicia had been found unfit in Tazewell County case Nos. 23-JA-17 and 23-JA-18, with no subsequent finding of fitness. Felicia stipulated to the amended petition's allegations, and the trial court adjudged H.H. a neglected minor.

¶ 13 On January 20, 2025, the State filed petitions to terminate Felicia's parental rights

as to J.H. and H.H. Both petitions alleged Felicia was an unfit parent because she failed to make reasonable progress toward the children's return to her care within the nine months from April 19, 2024, through January 19, 2025. See 750 ILCS 50/1(D)(m)(ii) (West 2024).

¶ 14                                    C. Fitness Hearing

¶ 15            The trial court conducted a fitness hearing on August 22, 2025. Janelle Robinson testified she was the caseworker assigned to the children's cases during the relevant nine-month period. Felicia was ordered to complete three drug drops per month, but she only completed one drop during the relevant nine-month period. She completed a substance abuse evaluation, but she did not follow the subsequent recommendations. During the relevant nine-month period, Felicia did not progress from supervised visits to unsupervised visits, and Robinson was never able to begin formulating a return home plan due to Felicia's lack of progress.

¶ 16            During the relevant nine-month period, Robinson observed Felicia's visits with J.H. and H.H. Felicia and J.H. "appear[ed] to be bonded." H.H. was "very attached to her caregiver." Felicia would try to engage with H.H., but H.H. had a clear preference for her foster parent. Robinson did not believe Felicia and H.H. had formed a mother-child bond.

¶ 17            Stacy testified she was Felicia's mother and J.H.'s foster parent. During the relevant nine-month period, Stacy communicated with Felicia in person "a couple times," and they also interacted via phone calls and text messages. Stacy testified she coordinated "quite a few visits" with Felicia, but "[m]ost of the time [Felicia] didn't show up for them." Stacy did not feel comfortable having Felicia in her home, and she always "wanted to have someone else present." Stacy felt this way due to "[t]hreats" and "[h]arassment" she received from Felicia. Stacy testified, "[Felicia] would message me on rants about how horrible I am and [J.H.] shouldn't be with me and things like that versus actually engaging and asking how he's doing."

According to Stacy, J.H. and Felicia "have good visits," but "[e]ventually [J.H.] just kind of assumed that [Felicia] wasn't gonna show up."

¶ 18    Paige P.-F. testified she was H.H.'s foster mother and Felicia's cousin. Paige only saw Felicia in person during supervised visits and when Felicia attended H.H.'s first birthday party. Paige would schedule other get-togethers and invite Felicia, but Felicia did not attend any of them. Paige testified Felicia "tried" to bond with H.H. during visits, but that became difficult when H.H. started to exhibit behaviors indicative of separation anxiety at approximately six months old. According to Paige, H.H. "was a typical baby, and she was developing appropriately."

¶ 19    Felicia testified there were "several services" she was supposed to be doing during the applicable nine-month time frame. She was supposed to complete a psychological exam, but she testified the exam was never scheduled. Based on Felicia's mental health assessment, it was recommended that she attend group therapy once per week and individual therapy once per month. Her group therapy sessions were specifically "dialectical behavioral therapy." She did not attend those sessions because she moved to a new city and did not have a vehicle or any other means of transportation. Felicia testified she contacted her caseworker, but the caseworker could not give her a ride because the sessions were scheduled for the evenings, outside of their working hours. Felicia did not contact the counseling facility to find a different time to participate in group therapy. Felicia did not seek to obtain access to reliable transportation during the nine-month period in question.

¶ 20    During examination by the trial court, Felicia claimed the one drug drop she attended was negative. On cross-examination, Felicia testified she "was not aware" that H.H. was born substance exposed. She subsequently admitted she read the amended shelter care

petition filed on October 6, 2023, which alleged H.H. was born with methamphetamine in her system. However, Felicia asserted, "I deny that happening because *** I never exposed her to anything and they never showed me anything in the hospital regarding that." Felicia acknowledged the court found H.H. was neglected because she was exposed to illicit drugs, but Felicia retorted, "They allegedly said this, but there was never any proof." Felicia further conceded she signed an answer to the amended petition in which she stipulated to the neglect allegations.

¶ 21　　　　The trial court found the State proved by clear and convincing evidence that Felicia failed to make reasonable progress toward the children's return to her care during the nine-month period from April 19, 2024, through January 19, 2025. The court emphasized H.H. came into the care of DCFS because, *inter alia*, she was born substance exposed, and Felicia was ordered to complete three drug drops per month. However, Felicia completed just one drop during the nine-month period in question. While Felicia testified that one drop came back negative, the court noted the State submitted an exhibit showing the drop came back positive for tetrahydrocannabinol (THC). Felicia did not complete any mental health counseling, nor did she complete any recommended substance abuse treatment. Felicia's visits with H.H. and J.H. did not become more frequent during the nine-month period. DCFS was "never in a position to recommend or approve unsupervised visits," nor could it formulate a return home plan.

¶ 22　　　　The trial court acknowledged Felicia "completed a lot of visits." However, the court highlighted that Felicia blamed DCFS for her failure to complete most of the services, and it did not find her testimony "to be very credible in light of the other evidence." For example, Felicia "was able to go to many visits and had no transportation issues," but "when it came to other *** services, she would blame lack of transportation or other barriers." The court believed

Felicia "loves her children very much," but it concluded "there was clearly a barrier there that appeared to be both substance abuse and mental health related." The court reiterated that Felicia's testimony minimized the concerns surrounding her substance abuse and mental health. The court determined, "[T]he agency certainly made all efforts possible to get her to comply with these services, and she simply did not."

¶ 23                                    D. Best-Interests Hearing

¶ 24          On October 3, 2025, the trial court conducted a best-interests hearing. Jessica Siadek testified she had been the caseworker assigned to J.H. and H.H. since June 2025. Siadek testified she had observed both children in their respective foster homes, and they appeared to be happy and loved. Both children's foster parents demonstrated love and affection and were willing to provide a permanent home. Siadek testified she observed a parental visit between Felicia, J.H., and H.H. H.H. became upset and would not calm down, so she was taken away after approximately half an hour. Siadek testified J.H. and Felicia appeared to be bonded, and "there was love and attachment there." Siadek reviewed reports from visits between Felicia and H.H., and she testified the reports did not indicate Felicia and H.H. were bonded or that love and attachment existed between them because the reports "typically indicate struggling behaviors from [H.H.]" According to Siadek, there was not an opportunity for Felicia and H.H. to demonstrate love and affection toward each other because most of the time was spent "trying to calm [H.H.] down." J.H. referred to Stacy's house as his "home." He "really enjoy[s] the environment there," and it was where he feels "safe" and "stable." Siadek believed it was in J.H.'s and H.H.'s best interests to terminate Felicia's parental rights.

¶ 25          David F. testified he had been H.H.'s foster father "basically since she was born." David was Paige's husband, and H.H. had been placed with them since July 1, 2023. H.H.

referred to David as "Daddy" and Paige as "Mommy." David and Paige ensured H.H. and J.H. were able to see each other. David testified he loved H.H. and saw her as his daughter. David and Paige were willing to have H.H. live with them permanently. On cross-examination, David testified Felicia was typically invited to family functions, but David and Paige "don't necessarily feel comfortable with her knowing where [they] live." H.H. enjoyed playing with David and Paige's two sons and watching *Mickey Mouse Clubhouse*. H.H. had her own room, which was decorated in "a princess dinosaur kind of theme." David had no concerns with H.H. remaining in their care.

¶ 26　　　　Felicia testified she texted her caseworker "regularly" to ask how J.H. and H.H. were doing, but she "[h]ardly ever" received a response. She claimed she did not attend her drug drops because "the agency was supposed to provide me with transportation," but it did not do so. Felicia did not consider the children's foster parents to be her family because "they kind of shut [her] out over the years," and "they don't make [her] feel welcome." She did not believe it was in J.H.'s best interests to live with Stacy because respondent did not "have a relationship" with her. She described their dynamic as "more combative" than nurturing, and she did not believe her mother demonstrated a "motherly instinct." Felicia believed J.H. was safe with his foster mother, but "not comfortable." This was because J.H. said he and his foster mother "don't really talk." Instead, he "always plays video games," and "[h]e's always in his room." Felicia testified she had "a very good bond" with J.H. and that he was her "whole world." Felicia testified she felt love and attachment toward H.H., but she "ha[d] not been able to have the time with her" necessary to form a reciprocal mother-daughter bond. On cross-examination, Felicia acknowledged she completed a drug drop on September 9, 2025, which tested positive for methamphetamine. However, she insisted it was a false positive, saying, "I did not use

methamphetamine at the time of the drop. There would have been no way I would test positive because I did not use this drug." Felicia claimed she had never used methamphetamine.

¶ 27    During closing arguments, the guardian *ad litem* (GAL) asserted she observed J.H. with his foster mother and "they both seemed very comfortable with each other, laughing, joking, making plans. The GAL had not observed J.H. indicating any discomfort with his foster mother, and the GAL had no concerns regarding his current placement. She stated H.H. appeared "very bonded" and "comfortable" with her foster family, who represented to the GAL that they "want[ed] to provide permanency." The GAL noted Felicia testified she never used methamphetamine, but H.H. came into DCFS's care in part due to her umbilical cord blood testing positive for methamphetamine. The GAL stated both foster placements "have provided a safe, secure environment for both of those children, kept them in communication and contact with their siblings, [and] have an extensive support system," and she requested the trial court grant the State's termination petition.

¶ 28    The State argued it was in the children's best interests to terminate Felicia's parental rights because J.H.'s and H.H.'s respective foster parents provided them with physical safety, food, shelter, and clothing. J.H.'s grades had drastically improved while he was under his foster mother's care, such that he no longer required an individualized education plan. H.H. had spent nearly her entire life with her foster family and was beginning to develop her own unique personality. Both foster placements were committed to maintaining the children's community ties, and the State argued it was "clear that the foster parents love these children" and "want to commit to permanency."

¶ 29    The trial court found the State met its burden and granted its petitions to terminate Felicia's parental rights as to J.H. and H.H. In giving its decision, the court asserted it considered

all the best-interests factors. The court found the respective foster placements "more than adequately" provided for the children's physical safety and welfare. The court found both J.H. and H.H. were able to develop their own identities in their foster placements, and they were allowed to develop family ties. The children felt "incredibly loved" by their respective foster parents. The court did not find Felicia's testimony credible, and it emphasized "the GAL has had *** dozens of interactions with [J.H.] and his foster parent. They're comfortable. He's shining there. *** [H]e clearly feels loved and attached there." The court asserted "these children need permanence," as both children came into DCFS's care in 2023, over two years before the hearing. The court opined, "At some point the limbo of being in substitute care is more damaging than anything else because [the children] just want finality." The court concluded that J.H. and H.H. "deserve permanence," and it granted the State's termination petition.

¶ 30       Felicia filed a notice of appeal, and the trial court appointed counsel to represent her.

¶ 31       This appeal followed.

¶ 32                            II. ANALYSIS

¶ 33       In December 2025, Felicia's appointed appellate counsel filed motions seeking leave to withdraw as counsel in both J.H.'s and H.H.'s cases, citing *Anders*. Counsel provided supporting memoranda and proofs of service. Felicia did not file a response. Counsel argues no arguably meritorious issue can be raised on appeal. We agree.

¶ 34                         A. Standard of Review

¶ 35       To terminate an individual's parental rights, the State must first show the parent is unfit by clear and convincing evidence and then show that terminating their parental rights serves the child's best interests by a preponderance of the evidence. *In re D.F.*, 201 Ill. 2d 476, 494-95

- 10 -

(2002); *In re D.T.*, 212 Ill. 2d 347, 366 (2004). "The trial court is given broad discretion and great deference in matters involving minors." *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001). We will not reverse an unfitness finding unless it is against the manifest weight of the evidence, as such a determination "involves factual findings and credibility determinations that the trial court is in the best position to make." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48. Likewise, we will not reverse a best-interests finding unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. "A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent." *Ta. T.*, 2021 IL App (4th) 200658, ¶ 48.

¶ 36                                  B. Unfitness Finding

¶ 37         The Adoption Act provides several grounds on which a trial court may find a parent unfit. 750 ILCS 50/1(D) (West 2024). Those grounds include a parent's failure "to make reasonable progress toward the return of the child *** during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2024). "[R]easonable progress" means "measurable or demonstrable movement toward the goal of the return of the child." *In re L.L.S.*, 218 Ill. App. 3d 444, 460-61 (1991). We have previously described "reasonable progress [a]s an objective standard," measuring whether "the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstratable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original and internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88.

¶ 38         There is no issue of arguable merit concerning the trial court's unfitness findings. The evidence supports the court's determination that Felicia failed to make reasonable progress

toward the return of J.H. and H.H. to her care during the nine-month period from April 19, 2024, through January 19, 2025. See 750 ILCS 50/1(D)(m)(ii) (West 2024). During that nine-month period, Felicia was required to complete three drug drops per month. She failed to appear at all but one of her scheduled drops. The one drop she completed tested positive for THC. During her testimony, Felicia acknowledged she had "several services" to complete, including a substance abuse evaluation, a psychological exam, and any subsequent recommended services. Felicia completed the substance abuse evaluation, but she did not engage in any recommended follow-up services. Felicia did not complete the psychological exam. She failed to engage in her recommended group therapy services. During her testimony, Felicia blamed this failure on a lack of transportation, as sessions were scheduled outside of business hours, when her caseworker would have been able to give her a ride. However, Felicia made no effort to reschedule her counseling sessions, and she did not procure a vehicle during the nine-month period. Due to Felicia's lack of progress, her caseworker was never able to begin formulating a return home plan for either child.

¶ 39         Based on this, the trial court found the State proved by clear and convincing evidence that Felicia failed to make reasonable progress toward the children's return to her care during the relevant nine-month period. Because the opposite conclusion is not clearly evident, we cannot determine the trial court's finding stands against the manifest weight of the evidence. *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011). Taken together, all the evidence proves clearly and convincingly that Felicia failed to make reasonable progress from April 19, 2024, through January 19, 2025, and was an unfit parent as defined by the Adoption Act. See *A.L.*, 409 Ill. App. 3d at 500.

¶ 40                   B. Best-Interests Determination

¶ 41    Once a trial court finds a parent unfit, it must consider whether terminating their parental rights serves the child's best interests. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364 (2004); see *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80 (stating that once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). When considering whether termination of parental rights serves a child's best interests, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2024). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006).

See 705 ILCS 405/1-3(4.05) (West 2024).

¶ 42    There is no issue of arguable merit regarding the trial court's best-interests finding. The evidence established it was in both J.H.'s and H.H.'s best interests to terminate Felicia's parental rights. The evidence showed J.H. referred to his foster mother's house as his

"home." He "really enjoy[ed] the environment there," and it was where he felt "safe" and "stable." While Felicia testified J.H. did not feel comfortable living with his foster mother, the GAL stated J.H. and his foster mother "both seemed very comfortable with each other." The GAL had not observed J.H. demonstrating any discomfort with his foster mother. The court found Felicia's testimony was not credible, asserting, "[T]he GAL has had *** dozens of interactions with [J.H.] and his foster parent. They're comfortable. He's shining there. *** [H]e clearly feels loved and attached there." J.H.'s foster mother was committed to providing J.H. with a permanent home.

¶ 43　　　H.H. had lived with her foster family for nearly her entire life. She referred to her foster parents as "Mommy" and "Daddy." H.H. enjoyed playing with her foster brothers and watching *Mickey Mouse Clubhouse*. She had her own room, which had a "princess dinosaur" theme. Her foster parents provided opportunities for H.H. and J.H. to see each other. H.H.'s foster father testified he saw her as his daughter, and he was willing to provide H.H. with a permanent home. H.H. was not bonded with Felicia because she would become very upset and worked up during visits, and most of the dedicated visitation time would be spent trying to calm H.H. down.

¶ 44　　　Based on this evidence, the trial court determined it was in J.H.'s and H.H.'s respective best interests to terminate Felicia's parental rights. We cannot say "the opposite conclusion is clearly apparent" from the record, nor can we find the court's decision to be "unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 45　　　　　　　　　　　　　III. CONCLUSION

¶ 46　　　After examining the record, the motion to withdraw, and the memorandum of law,

we agree with appointed appellate counsel this appeal presents no issue of arguable merit. Accordingly, for the reasons stated, we grant counsel's motion to withdraw and affirm the trial court's judgment.

¶ 47        Affirmed.